[Cite as *State v. Hamilton*, 2011-Ohio-2783.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | Case No. 09CA3330 |
| v. | : | |
| | : | <u>DECISION AND</u> |
| David Hamilton, Jr., | : | <u>JUDGMENT ENTRY</u> |
| | : | |
| Defendant-Appellant. | : | File-stamped date:  6-02-11 |

_____

<u>APPEARANCES:</u>

Timothy Young, Ohio State Public Defender, and Katherine A. Szudy, Ohio State Assistant Public Defender, Columbus, Ohio, for Appellant.

Mark E. Kuhn, Scioto County Prosecuting Attorney, Portsmouth, Ohio, for Appellee.

_____

Kline, J.:

**{¶1}**   David Hamilton, Jr. (hereinafter "Hamilton") appeals the judgment of the Scioto County Court of Common Pleas, which convicted him of aggravated murder, murder, aggravated burglary, felonious assault, tampering with evidence, and violation of a protection order.  Hamilton contends that the trial court abused its discretion when it refused to instruct the jury on a charge of voluntary manslaughter.  Because the evidence did not support a voluntary manslaughter instruction, we disagree.

I.

**{¶2}**   Hamilton killed Jonathan Jackson (hereinafter "Jackson") in the early morning hours of February 21, 2009.  Jackson's death represents the tragic conclusion of the tumultuous relationship between Hamilton and Stephanie Crump (hereinafter "Crump").  Hamilton and Crump had been in an on-again-off-again relationship for seven years.

During that time, Hamilton and Crump had three children.  Sadly, one child passed away.

{¶3}    Hamilton and Crump's relationship was marked by jealousy and violence. Hamilton had been violent with Crump on more than one occasion, and Crump had obtained two protection orders against Hamilton over the course of the relationship. Crump obtained the most recent protection order in February 2008.  Although the protection order commanded Hamilton not to have contact with Crump, the two appear to have reconciled at some point during the year.  Crump testified that Hamilton moved into her apartment in November 2008, but he had moved out just after Christmas that year.  At the time of the incident, Hamilton was living with his father, and Crump testified that Hamilton did not have a key to Crump's apartment.

{¶4}    On February 20, 2009, Hamilton had just received his income tax refund of about $2,000.  Hamilton and Crump were at Hamilton's residence early in the evening.  They apparently made plans to go out that night, so Hamilton arranged for a babysitter. Crump then left Hamilton's residence to go to her apartment to shower.  Hamilton expected her to return.  Instead, Crump decided to go to her neighbor Shauna Williams' (hereinafter "Williams") apartment.  Jackson and Zachary Fenimore (hereinafter "Fenimore") were also at Williams' apartment.

{¶5}    When Crump did not return, Hamilton began calling her.  Between 8:40 p.m. and midnight, Hamilton had called Crump twelve times.  And between midnight and 1:00 a.m., Hamilton had called Crump fourteen more times.  Hamilton also sent Crump several text messages.  Crump largely ignored Hamilton's attempts to contact her, except for the occasional curt response to Hamilton's text messages.  While he had

been trying to contact Crump, Hamilton received a ride to a local bar. He drank alcohol at the bar until around midnight, when he called a cab. The cab dropped Hamilton off near Crump's apartment around 12:38 a.m.

{¶6} Hamilton claimed that he had to use the restroom, so he knocked on Crump's front door. No one answered, and the door was locked. Hamilton next tried the back door, which was also locked. He then entered Crump's apartment through the kitchen window. After entering the apartment, Hamilton went upstairs and vomited in Crump's restroom. He then proceeded back down to the kitchen to get something to eat out of the refrigerator.

{¶7} Meanwhile, back at Williams' apartment, Crump, Williams, Fenimore, and Jackson were "hanging out," which involved listening to music, playing video games, and smoking marijuana. Williams did not have any beer, but Crump had some at her apartment. The group debated who would go over to Crump's apartment to get the beer from her refrigerator. Eventually, Jackson volunteered to go, and he took Crump's keys.

{¶8} Hamilton was standing by Crump's refrigerator when Jackson unlocked Crump's door and let himself into the apartment. On direct examination, Hamilton testified as follows:

{¶9} "A. I opened the refrigerator up and I heard somebody open the front door. (Witness crying) This guy had walked in that I've never seen before in my life, and I asked him, * * * 'Who are you?' I said 'Where is Stephanie at?'

{¶10} "Q. Who was this guy?

{¶11} "A. At that point I didn't know who this guy was.

**{¶12}** "* * *

**{¶13}** "A.  After I asked him who he was and where Stephanie was, he told me I believe not to worry about it and he come over there to get some beer.  And I told him, I was like 'I don't know who you are so you're not going to get nothing.'  I said – I said, I asked him to leave.

**{¶14}** "Q.  You use the language that was used.

**{¶15}** "A.  I told him to fucking leave because I didn't know who he was.

**{¶16}** "Q.  What'd he say?

**{¶17}** "A.  He said, he told me that he wasn't leaving and he grabbed a hold of me.

**{¶18}** "Q.  Now where are you at this time?

**{¶19}** "A.  Right here at the fridge.  * * *

**{¶20}** "Q.  * * * What happened when he got a hold of you?

**{¶21}** "A.  After he grabbed hold of me he took me and he threw me up against the counter right here.  (Witness referring to diagram)

**{¶22}** "* * *

**{¶23}** A.  Once he threw me up against the counter I started heading this way.  He comes and he hits me in the side of my face.  (Witness crying)

**{¶24}** "* * *

**{¶25}** "A.  I tried to go to the back door to get away from him.

**{¶26}** "* * *

**{¶27}** "Q.  What happened next?  Tell these people.

**{¶28}** "A.  He grabs - - he grabs a hold of me again and he's just throwing me around.  I get threw back up against the refrigerator, and at this point I don't know who this person

is, and I don't know why he's even trying to fight with me.  I'm pretty scared.  I remember grabbing a knife.

**{¶29}** "* * *

**{¶30}** "Q.  What'd you do with the knife once you picked it up from the counter?

**{¶31}** "A.  I headed to the front room.  It was in my hand and I started going to the front room.

**{¶32}** "Q.  Did you show the knife to this person?

**{¶33}** "A.  Yes, I did.

**{¶34}** "Q.  And what did he do?

**{¶35}** "A.  He just seemed like it didn't bother him. * * *

**{¶36}** "Q.  Did he back off?

**{¶37}** "A.  No, he did not.

**{¶38}** "Q.  What'd you do then?

**{¶39}** "A.  I went into the front room and he grabbed a hold of me again.

**{¶40}** "* * *

**{¶41}** "Q.  What happened in the living room?

**{¶42}** "A.  After he tried to pull me back I just kept trying to go for the front door, and then he just kind of grabs a hold of me and I fall right there by the – by the stair steps.

**{¶43}** "Q.  You still got the knife in your hand?

**{¶44}** "A.  Yes.

**{¶45}** "Q.  Has there been anybody cut yet?

**{¶46}** "A.  No.  And I fall right there at the steps.  When I fall, he's – he falls on top of me and –

**{¶47}** "Q.  There's been a fight, and you're saying that he had a hold of you?  Are you fighting?

**{¶48}** "A.  I'm not fighting back with him at this point, no.

**{¶49}** "Q.  Are you two fighting?

**{¶50}** "A.  Yes.  Fighting – I'm not fighting with him.  He's still * * * coming at me.

**{¶51}** "Q.  Are you outside the apartment yet?

**{¶52}** "A.  No.

**{¶53}** "Q.  What happened inside the apartment?

**{¶54}** "A.  After I fall down, he hits me in the back of my head two times.

**{¶55}** "* * *

**{¶56}** "A.  He hits me in the back of the head twice.  He said 'I'll fucking kill you.' (Witness crying)

**{¶57}** "Q.  He said that to you?

**{¶58}** "A.  Yes, he did.  He puts his arms around my neck and he's just standing there and choking me; and I can't breathe and I'm, I'm really scared.  (Witness crying)  And I just want to get this guy off me so I take the knife and started stabbing him.

**{¶59}** "Q.  How were you stabbing him?

**{¶60}** "A.  I just stabbed him.  He had a hold of me.  I don't know, I just stabbed him on this side.  It didn't last very long after that.  I just – I just remember trying to get him off of me.  And I believe he fought a little bit after – after I had stabbed him.  We had fought a little bit and I stabbed him a few more times.  I'm not sure how many times I stabbed him.  (Witness crying)[.]"  Tr. 950-956.

**{¶61}** Hamilton then testified that, at some point, Jackson said, "Dude, get off me[,]" and that Jackson left Crump's apartment followed almost immediately by Hamilton. Id. at 956. Hamilton also testified that he (i.e., Hamilton) weighed "140, 150 maybe[,]" and Hamilton noted that earlier testimony indicated that Jackson weighed 198 pounds. Id. at 960. Hamilton testified that Jackson was "[r]eally, really strong." Id. And when Jackson had Hamilton by the neck, Hamilton testified that he "couldn't breathe." Id.

**{¶62}** Hamilton testified that he did not stab Jackson outside Crump's apartment. According to Hamilton, after the two left the apartment, Hamilton ran away. Hamilton threw the knife in a ditch, and he later passed out and slept outside. Eventually, Hamilton turned himself in to the police.

**{¶63}** Fenimore, however, had a different version of what happened just after Jackson and Hamilton left Crump's apartment. According to Fenimore, about three or four minutes after Jackson left Williams' apartment, Fenimore saw Jackson running from Crump's apartment "with blood all over him and stuff." Id. at 431. Fenimore testified that he saw "David [Hamilton] following, running after him." Id. Fenimore also testified that Jackson was yelling "Stop" while Hamilton chased Jackson with a knife. According to Fenimore, "it was hard for [Jackson] to run[,]" and eventually, Jackson stopped at a car and Hamilton "just started stabbing [Jackson] some more." Id. at 433-434. Fenimore then testified that at that point, "I [i.e., Fenimore] ran outside * * *, I yelled 'Stop.' I was like 'Stop, stop.' And then [Hamilton] took off running or whatever." Id. at 434.

**{¶64}** The paramedics arrived shortly after the incident between Hamilton and Jackson, but Jackson had already passed away.

**{¶65}** The case was tried to a jury. Hamilton requested that the trial court issue an instruction on voluntary manslaughter. The trial court, however, denied the request. The trial court determined that the evidence supported a self-defense instruction, but not a voluntary manslaughter instruction.

**{¶66}** The jury found Hamilton "not guilty of Count 1: Aggravated Murder, in violation of [R.C.] 2903.01(A)[;] * * * guilty of Count 2: Aggravated Murder, in violation of [R.C.] 2903.01(B)[;] * * * guilty of Count 3: Murder, in violation of [R.C.] 2903.02(B)[;] * * * guilty of Count 4: Aggravated Burglary, in violation of [R.C.] 2911.11(A)(1)[;] * * * guilty of Count 5: Felonious Assault, in violation of [R.C.] 2903.11(A)(2) / (D)(1)[;] * * * guilty of Count 6: Tampering with Evidence, in violation of [R.C.] 2921.12(A)(1)[; and] * * * guilty of Count 7: Violating a Protection Order, in violation of [R.C.] 2919.27(A)(1)." November 3, 2009 Judgment Entry.

**{¶67}** Hamilton appeals and asserts the following assignment of error: "The trial court abused its discretion and deprived Mr. Hamilton of his right to due process under the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution by denying Mr. Hamilton's request that the jury receive a voluntary-manslaughter instruction."

II.

**{¶68}** In his sole assignment of error, Hamilton contends that the trial court erred when it refused to give the jury an instruction on voluntary manslaughter.

**{¶69}** "Generally, a trial court has broad discretion in deciding how to fashion jury instructions. A trial court must not, however, fail to 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and

discharge its duty as the fact finder.' *State v. Comen* (1990), 50 Ohio St.3d 206, [at] paragraph two of the syllabus. Additionally, a trial court may not omit a requested instruction, if such instruction is 'a correct, pertinent statement of the law and [is] appropriate to the facts * * *.' *State v. Lessin*[,] 67 Ohio St.3d 487, 493, [1993-Ohio-52] (quoting *State v. Nelson* (1973), 36 Ohio St.2d 79, [at] paragraph one of the syllabus).

**{¶70}** "In determining whether to give a requested jury instruction, a trial court may inquire into the sufficiency of the evidence to support the requested instruction. See [*Lessin*] at 494. A trial court is therefore vested with discretion to determine whether sufficient evidence was presented at trial [to] require[ ] a particular jury instruction. [*State v. Mitts*, 81 Ohio St.3d 223, 228, 1998-Ohio-635.] If, however, the evidence does not warrant an instruction a trial court is not obligated to give the requested instruction. See *Lessin* * * * at 494. Thus, in our review we must determine whether the trial court abused its discretion by finding that the evidence was insufficient to support the requested charge. See *Mitts* [at 228]; *State v. Wolons* (1989), 44 Ohio St.3d 64, [at] paragraph two of the syllabus[.]" *Smith v. Redecker*, Athens App. No. 08CA33, 2010-Ohio-505, at ¶51-52. See, also, *State v. Gary*, Hamilton App. No. C-090643, 2010-Ohio-5321, at ¶23; *State v. Jordan*, Trumbull App. No. 2009-T-0110, 2010-Ohio-5183, at ¶27; *State v. McClendon*, Montgomery App. No. 23558, 2010-Ohio-4757, at ¶13; *State v. Carter*, Ross App. No. 10CA3169, 2010-Ohio-6316, at ¶50-51; but, see, *State v. Howard*, Ross App. No. 07CA2948, 2007-Ohio-6331, at ¶27 ("[T]he issue of whether an instruction is required presents a question of law for de novo review.").

**{¶71}** R.C. 2903.03(A) defines voluntary manslaughter. This statute provides that "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of

which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *."

**{¶72}** "Before giving a jury instruction on voluntary manslaughter in a murder case, the trial judge must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *State v. Shane* (1992), 63 Ohio St.3d 630, at paragraph one of the syllabus. "In making that determination, trial courts must apply an objective standard: 'For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'" *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, at ¶81, quoting *Shane* at 635.

**{¶73}** If the objective prong is met, "the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the '* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *' must be considered." *Shane* at 634, quoting *State v. Deem* (1988), 40 Ohio St.3d 205, at paragraph five of the syllabus.

**{¶74}** When analyzing the subjective prong, "evidence supporting the privilege of self-defense, *i.e.*, that the defendant feared for his own and other's personal safety, does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute." *State v. Harris* (1998), 129 Ohio App.3d 527, 535. "While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of 'anger, hatred, jealously, and/or furious resentment.'" *State v. Levett*,

Hamilton App. No. C-040537, 2006-Ohio-2222, at ¶29, quoting *State v. Perdue*, 153

Ohio App.3d 213, 2003-Ohio-3481, at ¶12; see, also, *State v. Sudderth*, Lawrence App.

No. 07CA38, 2008-Ohio-5115, at ¶14; *State v. Hendrickson*, Athens App. No. 08CA12,

2009-Ohio-4416, at ¶45-46; *State v. Caldwell* (Dec. 17, 1998), Franklin App. No. 98AP-

165; *State v. Tantarelli* (May 23, 1995), Franklin App. No. 94APA11-1618 ("[A]ppellant

himself testified that he was dazed and confused and that he was scared. Appellant did

not state that he was angry. Instead, appellant testified that his only intent was to stop

the victim from hitting him anymore. The evidence presented by appellant simply does

not fit into the definition of voluntary manslaughter and the trial court correctly decided

not to give this instruction to the jury.").

**{¶75}** Here, even assuming that the objective prong was satisfied, Hamilton did not

satisfy the subjective prong of the voluntary-manslaughter test. There was insufficient

evidence that Hamilton actually was under the influence of sudden passion or in a

sudden fit of rage. Hamilton testified at length that he killed Jackson out of fear for his

own safety.

**{¶76}** Hamilton claimed that he acted in self-defense, not under the influence of sudden

passion or in a sudden fit of rage. Hamilton testified that Jackson was the initial

aggressor. Hamilton testified that Jackson threw him (i.e., Hamilton) against the

refrigerator. Then, after Hamilton attempted to get away, Hamilton testified: "[Jackson]

grabs hold of me again and he's just throwing me around. I get threw back up against

the refrigerator, and at this point I don't know who this person is, and I don't know why

he's even trying to fight with me. *I'm pretty scared*. I remember grabbing a knife." Tr.

at 952-53 (emphasis added).

**{¶77}** Hamilton testified that he showed Jackson the knife, but it "just seemed like it didn't bother [Jackson.]"  Id. at 954.  Hamilton then testified that he tried to make his way to the front door, but Jackson pulled him back.  Hamilton testified: "I'm not fighting with him.  He's still * * * coming at me."  Id. at 955.

**{¶78}** Hamilton testified that Jackson was choking him when Hamilton started stabbing Jackson.  And Hamilton claimed that he (i.e., Hamilton) was really scared when he started stabbing Jackson: "[Jackson] puts his arms around my neck and he's just standing there and choking me; and I can't breathe and I'm, *I'm really scared.* * * * And I just want to get this guy off me so I take the knife and started stabbing him."  Id. at 955-56 (emphasis added).  Hamilton also testified that, when the stabbing began, "I started to panic.  I couldn't breathe.  I just, I thought I was going to die."  Id. at 1027.

**{¶79}** Additionally, on cross-examination, Hamilton testified that he was not angry when the confrontation with Jackson began:

**{¶80}** "Q.  Now this guy comes in [to Crump's apartment] and you're telling him to leave."

**{¶81}** "A.  Yes.

**{¶82}** "Q.  And what is he telling you?

**{¶83}** "A.  I just know that he was there to get the beer.  He said something about getting some beer.

**{¶84}** "Q.  And he's not leaving.

**{¶85}** "A.  He's not leaving.

**{¶86}** "Q.  Did it make you angry?

**{¶87}** "A.  No.

{¶88} "Q.  No?

{¶89} "A.  No."  Tr. at 1009.

{¶90} Thus, Hamilton repeatedly testified that he was afraid of Jackson.  And Hamilton specifically stated that he was not angry when he confronted Jackson.  The evidence before the trial court showed that neither rage nor passion motivated the killing.  As the trial court properly determined, the evidence supported an instruction on self-defense, not voluntary manslaughter.

{¶91} Hamilton argues that, although he testified that he was scared when the confrontation began, he did not testify that he remained scared.  As evidence that Hamilton acted out of rage, Hamilton points to Fenimore's testimony that Hamilton chased Jackson down the street and stabbed Jackson several more times before Hamilton ran off.[1]  Hamilton notes that Dr. Susan Allen, the forensic pathologist who performed the autopsy on Jackson, testified that Jackson sustained eleven stab wounds.  Hamilton also alludes to the on-again-off-again and jealous nature of Hamilton's relationship with Crump to support the argument that Hamilton acted out of rage when he confronted Jackson in Crump's apartment.

{¶92} This is not sufficient evidence to warrant a voluntary manslaughter instruction.  While it may be "some evidence," at best, of rage or passion, the Supreme Court of Ohio has cautioned that "some evidence" supporting a voluntary manslaughter instruction does not mean that a voluntary manslaughter instruction must be given.  See *Shane* at 633 ("To require an instruction to be given to the jury every time 'some

---

[1] Hamilton testified that he did not stab Jackson outside of Crump's apartment, and Hamilton acknowledged that his testimony was different from Fenimore's regarding the events outside Crump's apartment.

evidence,' however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense."); see, also, *State v. Young* (Sep. 20, 1999), Belmont App. No. 96-BA-34; *State v. Collins* (1994), 97 Ohio App.3d 438, 446.

**{¶93}** Here, Hamilton's attempt to shoehorn a voluntary manslaughter argument with "some evidence" of rage or passion must fail. Hamilton made it very clear that neither rage nor passion motivated the killing. He testified that he was acting in self-defense. Hamilton did not indicate that his fear of Jackson ever transformed into rage, and the record does not support such a conclusion. Fennimore's testimony that Hamilton stabbed Jackson outside Crump's apartment, which Hamilton denied, does not necessarily show that Hamilton acted out of rage. Moreover, considering the severity of the struggle, evidence that Jackson sustained eleven stab wounds is not sufficient to demonstrate rage or passion. And there is no evidence that Hamilton killed Jackson in a fit of rage or passion caused by jealousy over Crump. Thus, the trial court correctly denied the voluntary manslaughter instruction. See *Hendrickson* at ¶46 ("Clearly, the crux of Hendrickson's testimony was that [he] acted out of fear, not passion or rage. He consistently testified that he was 'fearful' for his life and 'scared' he might die; he 'panicked' and reacted to protect himself. * * * Because Hendrickson failed to present evidence to show that he actually acted under a sudden passion or fit of rage, the trial court was correct in refusing to instruct on voluntary manslaughter.").

**{¶94}** Finally, Hamilton argues, "given that the jury found Mr. Hamilton not guilty of premeditated murder, the trial court's decision not to give a voluntary-manslaughter instruction prejudiced the outcome of Mr. Hamilton's trial." Appellant's Brief at 29.

Hamilton apparently argues that the acquittal on the premeditated murder count demonstrates that, had the trial court given a voluntary manslaughter instruction, the jury would have convicted Hamilton of voluntary manslaughter rather than murder. We disagree.

**{¶95}** "Even though voluntary manslaughter is not a lesser-included offense of murder, the test for whether a trial court should give a jury an instruction on voluntary manslaughter when a defendant is charged with murder is the same test applied when a defendant seeks an instruction on a lesser-included offense." *Levett* at ¶24, citing *Shane* at 632. "A trial court is required to instruct the jury on a lesser-included offense 'only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense.'" *Levett* at ¶25 quoting *State v. Thomas* (1988), 40 Ohio St.3d 213, at paragraph two of the syllabus.

**{¶96}** Hamilton's acquittal on premeditated murder does not mean that the trial court should have given a voluntary manslaughter instruction. The jury found Hamilton not guilty of aggravated murder in violation of R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another." Despite acquitting Hamilton on the premeditated murder charge, the jury convicted him of two other counts of murder. The jury convicted Hamilton for violating both R.C. 2903.01(B) and R.C. 2903.02(B). R.C. 2903.01(B) prohibits causing the death of another while committing or attempting to commit "kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape." (The jury convicted Hamilton of aggravated burglary). And R.C. 2903.02(B) prohibits proximately causing the death of another while committing a crime

of violence that is a felony of the first or second degree (here, felonious assault – a

second degree felony).

**{¶97}** A defendant can commit murder in violation of either R.C. 2903.01(B) or

2903.02(B) without the elements necessary for voluntary manslaughter present (i.e.,

provocation by the victim and uncontrollable rage by the defendant). Thus, it does not

follow that the acquittal on premeditated murder demonstrates that, had the jury been

instructed on voluntary manslaughter, the jury would have convicted Hamilton of

voluntary manslaughter, instead of the other counts of murder. Additionally, the lesser-

included-offense test was not met because the evidence did not support a conviction for

voluntary manslaughter. As detailed above, Hamilton did not satisfy the subjective

prong of the voluntary-manslaughter test.

**{¶98}** Thus, the trial court did not abuse its discretion when it declined to give a jury

instruction on voluntary manslaughter. Accordingly, we overrule Hamilton's sole

assignment of error.

III.

**{¶99}** In conclusion, having overruled Hamilton's sole assignment of error, we affirm

the judgment of the trial court.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED.  Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Abele, J. and McFarland, J.:  Concur in Judgment and Opinion.


For the Court


BY:_____
         Roger L. Kline, Judge



### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**