[Cite as *State v. Goff*, 2013-Ohio-42.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | Case No. 11CA20 |
| v. | : | |
| | : | DECISION AND |
| Megan R. Goff, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | Filed: January 7, 2013 |

_____

APPEARANCES:

Paula Brown, William H. Bluth, and Richard R. Parsons, Kravitz, Brown & Dortch, LLC, Columbus, Ohio, for Appellant.

J.B. Collier, Jr., Lawrence County Prosecuting Attorney, and Brigham M. Anderson, Lawrence County Assistant Prosecuting Attorney, Ironton, Ohio, for Appellee.

_____

Kline, J.:

{¶1} Megan Goff (hereinafter "Megan") appeals the judgment of the Lawrence County Court of Common Pleas, which convicted her of murdering her husband, William Goff (hereinafter "William"). Megan contends that the trial court erred when the court referenced the duty to retreat in its self-defense instruction. Because the evidence at trial supported an instruction on the duty to retreat, we disagree. Next, Megan contends that her conviction should be reversed based on various errors in connection with the grand jury proceedings. Megan argues that improper evidence from the grand jury proceedings demonstrates that the trial court should have granted her motion to dismiss. Because Megan cannot show that the indictment was invalid on its face, we disagree. Megan also argues that reversal is warranted because the state failed to

record the entirety of the grand jury proceedings. Because Megan cannot show that she was prejudiced by this error, reversal is not warranted on this basis. Next, Megan contends that the trial court erred by failing to instruct the jury on the imperfect self-defense doctrine. Ohio does not recognize the imperfect self-defense doctrine. Consequently, the trial court did not err when it refused to instruct the jury on the imperfect self-defense doctrine. Next, Megan contends that her conviction should be reversed because the trial court's murder instruction prevented the jury from considering the inferior offense of voluntary manslaughter. Because there was no evidence that Megan was under the influence of sudden passion or in a sudden fit of rage when she shot her husband, a voluntary manslaughter instruction was not warranted. Therefore, Megan cannot show that she was prejudiced by the trial court's alleged error. Finally, Megan contends that the trial court erred when it denied her motion to disqualify the Lawrence County Prosecutor's Office and one of the state's witnesses. Because Megan cannot demonstrate the prejudice necessary to justify granting a motion to disqualify, we disagree. Accordingly, we affirm the judgment of the trial court.

I.

{¶2} When Megan was 15 years old, she and her family moved next door to William. At the time, William was 40 years old, and he lived alone. Eventually, Megan and William developed a sexual relationship. Megan married William when she was 19 years old. When Megan was 21 years old, she gave birth to a daughter. A few years later, Megan gave birth to a son. Megan claimed that William was often emotionally abusive during the marriage. Additionally, Megan claimed that William had threatened to become violent on several occasions.

{¶3}  Megan and William's marital difficulties escalated in late 2005 and early 2006.  Megan claimed that, during that time period, William told her that he was going to kill her and the children.  According to Megan, William kicked the couple's son in the stomach on January 18, 2006.  Later that same day, Megan left the marital residence with her children.  They went to a domestic violence shelter in Kentucky.  Megan also filed domestic violence charges against William.  (As a result of the domestic violence charges, law enforcement removed 63 guns from the home.)  In addition to filing the domestic violence charges, Megan initiated divorce proceedings.

{¶4}  Megan claimed that William attempted to track her and the children down after they left the residence.  While Megan and the children were staying at the domestic violence shelter in Kentucky, an employee of the shelter spotted a man resembling William near the shelter.  This caused the shelter to go on lock down.  Shortly after that incident, Megan and the children left the shelter.  Eventually, they moved into an apartment in West Virginia.

{¶5}  In early March 2006, Megan recorded a phone conversation that she had with William.  (The recording was played at trial.)  At the beginning of the conversation, Megan informed William that she was recording the call.  During the conversation, William admitted that he previously said he was going to kill Megan and the children.  He claimed the statement was for "shock value" based on statements Megan had made about suicide.  (Megan responded by telling William that he was taking her comments out of context and that she had been referring to what she would do if she was ever terminally ill.)

{¶6}   Apparently, Megan and William had at least one unrecorded phone conversation on March 17, 2006.  According to Megan, William again told her that he would kill her and the children.  She testified that, after speaking with William on March 17, she became convinced that he was going to carry out his threat.

{¶7}   Megan drove to William's house on Saturday, March 18, 2006.  She stated that she intended to persuade William to kill her but not the children.  Megan claimed that she believed that if William killed her, it would somehow prevent him from killing the children.

{¶8}   Megan arrived at the house armed with two handguns.  (Megan claimed that she carried two guns because, earlier in their marriage, William had advised her to always carry two guns in case one of the guns jammed.)  Megan testified that, after she knocked on the door, William answered and said, "I didn't think you had the guts." August 2011 Trial Tr. at 396.  She also claimed that William told her to "get in here." *Id.* Next, Megan stated that, after she entered the house, she did not feel that she could get out of the house because William blocked the door.  Megan testified that William told her that her mother "was going to have a birthday present and it was going to be two dead grand kids and a dead daughter." *Id.* at 402.  (Megan's mother's birthday was on the following Monday, i.e., March 20.)

{¶9}   Shortly thereafter, Megan shot William multiple times, and he died as a result of the gunshot wounds.  Megan called 911 to report that she had shot William. The recording of the 911-call was played at trial.  During the 911-call, the dispatcher struggled to convince Megan to calm down.  Megan claimed she feared that William would still be able to harm her despite his multiple gunshot wounds.

{¶10} Detective Aaron Bollinger investigated the incident on the evening of the shooting. Megan agreed to give taped statements to Det. Bollinger, and the statements were played at trial. In the statements, Megan told Det. Bollinger that she killed William because she feared that he would kill her and the children.

{¶11} On March 28, 2006, a grand jury indicted Megan on one count of aggravated murder. In late April and early May 2007, a bench trial was held, and Megan was found guilty of aggravated murder with a firearm specification. Megan appealed, and we affirmed her conviction. *See State v. Goff*, 4th Dist. No. 07CA17, 2009-Ohio-4914, ¶ 160. The Supreme Court of Ohio, however, reversed our decision because a witness for the state provided testimony that violated Megan's right against self-incrimination. *See State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 1.

{¶12} Following the Supreme Court of Ohio's decision, Megan received a new trial. Megan's case was tried to a jury in August 2011. At trial, Megan claimed that she shot William in self-defense and that she suffered from battered woman's syndrome. A psychiatrist testified that, in his opinion, Megan believed that she and her children were in imminent danger of death or serious bodily injury when she shot William. The jury nevertheless found Megan guilty of murder with a firearm specification.

{¶13} Megan appeals and asserts the following assignments of error: I. "IT WAS ERROR TO INSTRUCT THE JURY THAT DEFENDANT-APPELLANT HAD A DUTY TO RETREAT WHEN SHE SHOT HER HUSBAND IN THE MARITAL RESIDENCE. (Defendant's Proposed Special Instructions to the Jury (Exhibit F); Court Exhibit 1 (Exhibit G): Tr. 349-78, 382-84, 577, 595, 681-87.)" II. "THE TRIAL COURT ERRED

TO THE PREJUDICE OF THE DEFENDANT WHEN IT DENIED THE DEFENDANT'S [sic] FAILURE TO PROPERLY RECORD ALL OF THE PROCEEDINGS PURSUANT TO CRIM.R. 22 AND THE OHIO SUPREME COURT'S HOLDING IN STATE V. GREWELL, 45 Ohio St. 3d 4, AND BECAUSE THE GRAND JURY WAS NEVER INSTRUCTED ON THE LAW AND WAS MISLED BY THE STATE, ALL IN VIOLATION OF MS. GOFF'S FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION [sic].  (July 22, 2012, Pretrial Motion hearing, Tr. 18-19; Grand Jury Transcript ('GJ Tr.') 1-151; Entry August 2, 2011; Entry April 13, 2011.)"  III. "IT WAS ERROR TO REFUSE TO CHARGE THE JURY ON THE DOCTRINE OF IMPERFECT SELF-DEFENSE WHICH, IF ACCEPTED BY THE JURY, WOULD HAVE MITIGATED DEFENDANT'S CRIME FROM MURDER TO VOLUNTARY MANSLAUGHTER.  (911 Tape (State's Trial Exhibit 3); Defendant's Proposed Special Instructions to the Jury (Exhibit F); 370-71, 373, 391-93, 395, 401-02, 490, 496-97, 574, 589, 595, 770-72.)"  IV. "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO PROPERLY INSTRUCT THE JURY AS TO WHEN IT SHOULD CONSIDER THE INFERIOR OFFENSE OF VOLUNTARY MANSLAUGHTER AND ABUSED ITS DISCRETION IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL REGARDING THIS ISSUE.  (Jury Instructions (Exhibit N); Tr. 769:18-21, 770:7-13, 791, 794-95.)" And V. "THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT THE DEFENDANT'S MOTION TO DISQUALIFY THE LAWRENCE COUNTY PROSECUTOR'S OFFICE AND APPOINT A SPECIAL PROSECUTOR AND DISQUALIFY DETECTIVE BOLLINGER FROM TESTIFYING IN THIS CASE IN

VIOLATION OF MS. GOFF'S RIGHTS TO A FAIR TRIAL UNDER THE UNITED

STATES AND OHIO CONSTITUTIONS.  (July 22, 2011 Pretrial hearing Tr. 44-47, 54)"

II.

{¶14}  In her first assignment of error, Megan argues that the trial court erred

when it included the duty to retreat in its self-defense instruction.

{¶15}  A trial court generally has broad discretion in deciding how to fashion jury

instructions.  *See State v. Hamilton*, 4th Dist. 09CA330, 2011-Ohio-2783, ¶ 69.

However, "a trial court must fully and completely give the jury all instructions which are

relevant and necessary for the jury to weigh the evidence and discharge its duty as the

fact finder."  *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two

of the syllabus.  "Additionally, a trial court may not omit a requested instruction, if such

instruction is 'a correct, pertinent statement of the law and [is] appropriate to the facts * *

*.'"  (Alteration sic.)  *Hamilton* at ¶ 69, quoting *Smith v. Redecker*, 4th Dist. No. 08CA33,

2010-Ohio-505, ¶ 51, in turn quoting *State v. Lessin*, 67 Ohio St.3d 487, 493, 620

N.E.2d 72 (1993).

{¶16}  "'In determining whether to give a requested jury instruction, a trial court

may inquire into the sufficiency of the evidence to support the requested instruction.'"

*Hamilton* at ¶ 70, quoting *Redecker* at ¶ 52; *see also Lessin* at 494.  Therefore, a trial

court is vested with discretion "to determine whether the evidence is sufficient to require

a jury instruction * * *."  *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998);

*see also State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989), paragraph two of

the syllabus.  "'If, however, the evidence does not warrant an instruction a trial court is

not obligated to give the requested instruction.'"  *Hamilton* at ¶ 70, quoting *Redecker* at

¶ 52. Thus, "'we must determine whether the trial court abused its discretion by finding that the evidence was insufficient to support the requested charge.'" *Id.*[1] "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶17}  At trial, Megan claimed (1) that she suffered from battered woman's syndrome and (2) that she acted in self-defense and in defense of her two children when she shot William.  Generally, to establish self-defense, a defendant must prove by a preponderance of the evidence

> (1) [that she] was not at fault in creating the situation
>
> giving rise to the affray, (2) [that she] had reasonable
>
> grounds to believe and an honest belief that [she] was
>
> in immediate danger of death or great bodily harm
>
> and that [her] only means of escape from such danger

---

[1] *See also State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 72 ("[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction."); *see also State v. Gary*, 1st Dist. No. C-090643, 2010-Ohio-5321, ¶ 23; *State v. Reese*, 2d Dist. No. 22907, 2009-Ohio-5046, ¶ 34; *State v. Chaney*, 3d Dist. No. 13-07-30, 2008-Ohio-3507, ¶ 38; *State v. Carter*, 4th Dist. No. 10CA3169, 2010-Ohio-6316, ¶ 51; *State v. Cutts*, 5th Dist. No. 2008CA79, 2009-Ohio-3563, ¶ 72; *State v. Jones*, 6th Dist. No. S-08-034, 2010-Ohio-1780, ¶ 20; *State v. Phipps*, 7th Dist. No. 04 MA 52, 2006-Ohio-3578, ¶ 10; *State v. Sekic*, 8th Dist. No. 95679, 2011-Ohio-4809, ¶ 34; *State v. Smith*, 9th Dist. No. 23542, 2007-Ohio-5119, ¶ 9; *State v. Peterson*, 10th Dist. No. 09AP-34, 2009-Ohio-5088, ¶ 15; *State v. Dukes*, 11th Dist. No. 2010-P-27, 2011-Ohio-6849, ¶ 45; *State v. Tucker*, 12th Dist. No. CA2010-10-263, 2012-Ohio-139, ¶ 31; *but see State v. Howard*, 4th Dist. No. 07CA2948, 2007-Ohio-6331, ¶ 27 ("[T]he issue of whether an instruction is required presents a question of law for de novo review."), quoting *State v. Depew*, 4th Dist. No. 00CA2562, 2002-Ohio-6158, ¶ 24, in turn quoting *State v. Powell*, 4th Dist. No. 96CA2257, 1997 WL 602864, *1 (Sept. 29, 1997).

was by the use of force, and (3) [that she] had not

violated any duty to escape to avoid the danger.

*State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-

Ohio-4416, ¶ 23.

**{¶18}** Megan argues that the trial court erred by including duty-to-retreat

language in its self-defense instruction. According to Megan, she did not have a duty to

retreat because she was in her home when the incident occurred. Megan claimed that,

even though she and the children left the marital residence in January 2006, the

residence was still her home on the date of the incident. As a result, Megan provided

the trial court with a proposed self-defense instruction that did not include language on

the duty to retreat. Instead, the proposed instruction asked the jury to consider only the

first two elements of self-defense listed above. The trial court, however, declined to

adopt Megan's proposed instruction. Thus, we must analyze whether the evidence

required the trial court *to omit* an instruction on the duty to retreat.

**{¶19}** Megan contends that she had no duty to retreat because she was a

cohabitant in the home where the shooting occurred. To support this argument, Megan

relies on the Supreme Court of Ohio's decision in *State v. Thomas*, 77 Ohio St.3d 323,

673 N.E.2d 1339 (1997). In *Thomas*, the court held that "[t]here is no duty to retreat

from one's own home before resorting to lethal force in self-defense against a

cohabitant with an equal right to be in the home." *Id.* at syllabus. Of course, the

applicability of *Thomas* depends upon whether the defendant was a cohabitant of the

home where the incident occurred. "Although the location of [one's] 'home' may change

depending upon circumstances, the place inhabited by a person at the time of an

altercation constitutes [her] 'home' for self-defense purposes." *State v. Taylor*, 2d Dist. No. 95-CA-25, 1996 WL 562796, *6 (Sept. 27, 1996); *see also State v. Johnson*, 10th Dist. No. 06AP-878, 2007-Ohio-2792, ¶ 45.

{¶20} Here, *Thomas* does not apply because, at the time of the incident, Megan did not inhabit the residence where the shooting occurred. The evidence shows that, when she shot William, Megan had moved out of the residence and had no intention of returning. Megan left the residence on January 18, 2006, and she filed for divorce shortly thereafter. In early February 2006, Megan's divorce attorney and William's divorce attorney reached an agreement regarding the residence. William's divorce attorney testified that there was an agreement that William would receive the residence. And at some point before the incident, either Megan's attorney or someone from Megan's family delivered Megan's keys to the residence to William's attorney's office. Moreover, Det. Bollinger interviewed Megan shortly after the shooting occurred. When Det. Bollinger was preparing a *Miranda*-rights waiver form, Megan informed him that her address was an apartment in West Virginia. Megan also admitted on cross-examination that she was living in West Virginia on the date of the incident.

{¶21} Furthermore, Megan's statements to William during the recorded phone conversation show that she did not consider the residence her home. During the conversation, Megan stated the following to William: "We're getting a divorce. I want you not to have visitation, unsupervised, with my children. *I want you to be able to keep your house. * * * That's what I want. Keep your house and let me and the kids go and * * * just quit even trying to find us.*" (Emphasis added.) August 2011 Trial Tr. at 432-433.

{¶22} Additionally, Megan's testimony shows that she did not intend on returning to the residence as a co-inhabitant. Just before Megan left the residence on January 18, 2006, she attempted to film William's abusive behavior. The video was played at trial. And at one point in the video, Megan took an inventory of the items in the house. At trial, her explanation for taking the inventory was as follows: "My mom told me to inventory everything in the house and show how many clothes, toys, stuff like that. *I knew I wasn't going back* and I knew we couldn't get all that stuff out of the house. I was really afraid that he would burn it down, destroy their stuff." (Emphasis added.) *Id.* at 378-379. Finally, regarding why she went to the residence on the date of the incident, Megan testified, "I needed [William] to know I was serious that I wasn't coming back." *Id.* at 392.

{¶23} Thus, the evidence shows that Megan was not a cohabitant in the residence where the incident occurred. As a result, the trial court did not abuse its discretion when it instructed the jury to consider whether Megan violated a duty to retreat.

{¶24} Accordingly, we overrule Megan's first assignment of error.

III.

{¶25} In her second assignment of error, Megan argues that the trial court erred when it failed to dismiss the indictment based on (1) the state's failure to record all of the grand jury proceedings and (2) allegedly improper testimony during the grand jury proceedings.

{¶26} Megan's motion to dismiss does not require us to examine factual findings made by the trial court. As a result, our review is de novo. *See State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 12 (8th Dist.)

{¶27} As indicated above, there are two components to Megan's arguments in this assignment of error. Megan bases an argument on the fact that the grand jury proceedings were not recorded in their entirety. Megan also bases an argument on the portions of the grand jury proceedings that were recorded.

A.

{¶28} We will first address Megan's argument that the trial court should have granted her motion to dismiss based on the recorded portion of the grand jury proceedings. She contends that the recorded portions of the proceedings reveal improper testimony that should have caused the trial court to grant her motion to dismiss. However, "[a] motion to dismiss tests the sufficiency of the indictment, without regard to the quantity or quality of evidence that may be produced at trial. * * * A pretrial motion must not involve a determination of the sufficiency of the evidence to support the indictment. If the indictment is valid on its face, a motion to dismiss should not be granted." *Preztak* at ¶ 12. And here, the indictment is valid on its face. Additionally, Megan's assertions regarding the recorded portions of the grand jury testimony require "examination of evidence beyond the face of the complaint." *Cleveland v. Olivares*, 197 Ohio App.3d 78, 2011-Ohio-5271, 966 N.E.2d 285, ¶ 8 (8th Dist.). Therefore, Megan's arguments regarding this evidence should have been "presented as a motion for acquittal under Crim.R. 29 at the close of the prosecution's case." *Id.*

**{¶29}** Thus, for the reasons stated above, the trial court did not err in denying Megan's motion to dismiss based on the recorded portions of the grand jury testimony.

B.

**{¶30}** Next, we consider Megan's argument that the trial court should have granted her motion to dismiss because portions of the grand jury proceedings were not recorded.

**{¶31}** In general, "[g]rand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *State v. Patterson*, 28 Ohio St.2d 181, 277 N.E.2d 201 (1971), paragraph three of the syllabus; *accord State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 41. "A particularized need is established 'when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial.'" *Id.* at ¶ 41, quoting *State v. Sellards*, 17 Ohio St.3d 169, 173, 478 N.E.2d 781 (1985).

**{¶32}** Crim. R. 22 provides that "[i]n serious offense cases all proceedings shall be recorded." And "[p]ursuant to Crim. R. 22 grand jury proceedings in felony cases must be recorded." *State v. Grewell*, 45 Ohio St.3d 4, 9, 543 N.E.2d 93 (1989). Thus, "if the defendant demonstrates a particularized need, Crim.R. 6(E) gives him or her the right to inspect all relevant portions of that testimony." *State v. Henness*, 10th Dist. No. 94APA02-240, 1996 WL 52890, *11 (Feb. 6, 1996). *See also State v. Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982 (1981), paragraph four of the syllabus.

{¶33} Here, Megan and the state stipulated that Megan had a particularized need to review the grand jury transcript. Megan and the state filed a joint motion for the production of the grand jury transcript, which the trial court granted. Although a significant amount of the grand jury proceedings were recorded, there were portions of the grand jury proceedings that were not recorded. Moreover, Megan and the state simply stipulated to a particularized need without actually articulating the particularized need. Consequently, we cannot determine whether the trial court provided Megan the "relevant" portions of the grand jury proceedings.

{¶34} As a result, based on (1) Megan's *stipulated* particularized need to review the grand jury transcripts and (2) the state's failure to provide the full transcripts as required, Megan has established error in the proceedings below. That is, Megan has shown that there was a "'[d]eviation from a legal rule.'" (Alteration sic.) *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 732-733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

{¶35} Next, we "must engage in a specific analysis of the trial court record – a so-called 'harmless error' inquiry – to determine whether the error 'affect[ed] substantial rights' of the criminal defendant." (Alteration sic.) *Fisher* at ¶ 7, quoting Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). "This language has been interpreted to 'mean[] that the error must have been *prejudicial:* It must have affected the outcome of the [trial] court proceedings.'" (Emphasis and alterations sic.) *Fisher* at ¶ 7, quoting *Olano* at 734. Here, Megan asserts that the error "affected the substantial rights of the accused," but she does not articulate how the failure to record the grand jury proceedings affected the

outcome of the proceedings.  Appellant's Merit Brief at 11.  Instead, Megan focuses her argument on the fact that the instructions of law to the grand jury were not recorded.

{¶36}  Megan's argument does not demonstrate that she was prejudiced by the state's failure to record the entirety of the grand jury proceedings.  "[T]he purpose of the grand jury is to determine if probable cause exists to believe that the crime alleged has been committed and that the defendant committed it * * *."  *State v. Hunsaker*, 78 Ohio App.3d 251, 256, 604 N.E.2d 247 (3d Dist.1992).  Here, the grand jury indicted Megan on one count of aggravated murder in violation of R.C. 2903.01(A) with a firearm specification.  R.C. 2903.01(A) provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *."  The recorded portions of the grand jury proceedings demonstrate that the state presented sufficient evidence to establish probable cause that Megan committed aggravated murder and that she used a firearm in committing the offense.  As a result, the fact that the instructions to the grand jury were not recorded did not affect the outcome of the trial court proceedings.  Consequently, Megan was not prejudiced by the failure to record the grand jury proceedings in their entirety.

{¶37}  Accordingly, for the reasons stated above, we overrule Megan's second assignment of error.

IV.

{¶38}  In her third assignment of error, Megan argues that the trial court erred by not instructing the jury on the so-called imperfect self-defense doctrine.

{¶39}  As stated above, a trial court is vested with discretion "to determine whether the evidence is sufficient to require a jury instruction * * *."  *Mitts*, 81 Ohio St.3d

at 228, 690 N.E.2d 522. And we must determine "whether the trial court abused its discretion by finding that the evidence was insufficient to support the requested charge." *Hamilton*, 2011-Ohio-2783, at ¶ 70.

{¶40} The imperfect self-defense doctrine would have allowed Megan to mitigate her murder conviction to a voluntary manslaughter conviction if she had an honest, *but unreasonable*, belief that she was in danger of death or great bodily harm from William. *See Dykes v. State*, 319 Md. 206, 213, 571 A.2d 1251 (1990). As Megan acknowledges, Ohio does not recognize the imperfect self-defense doctrine. Megan, however, argues that "[t]he doctrine of imperfect self-defense as a means of mitigating an intentional, but not premeditated, killing to voluntary manslaughter has a long history in the criminal law." Appellant's Merit Brief at 18. Megan notes that thirteen jurisdictions have adopted the imperfect self-defense doctrine. She asserts that the trial court should have given the jury her proposed imperfect-self-defense instruction.

{¶41} As stated, a trial court has discretion to determine whether the evidence is sufficient to require a jury instruction. And here, the trial court did not abuse its discretion by refusing to instruct the jury on a doctrine that Ohio law does not recognize. Thus, the trial court did not err when it refused to instruct the jury on the imperfect self-defense doctrine.

{¶42} Accordingly, we overrule Megan's third assignment of error.

V.

{¶43} In her fourth assignment of error, Megan argues that the trial court's instructions were erroneous because the wording of the murder instruction foreclosed consideration of the voluntary manslaughter instruction.

{¶44} Our review of "whether jury instructions correctly state the law is de novo." *State v. Kulchar*, 4th Dist. No. 10CA6, 2011-Ohio-5144, ¶ 15. "However, reversible error should not be predicated upon one phrase or one sentence in a jury charge; instead, a reviewing court must consider the jury charge in its entirety." *Id.*, citing *State v. Porter*, 14 Ohio St.2d 10, 13, 235 N.E.2d 520 (1968). "[I]f an instruction correctly states the law, its precise wording and format are within the trial court's discretion." *Kulchar* at ¶ 15.

{¶45} Megan argues that the trial court's jury instruction for murder prevented the jury from considering whether Megan committed voluntary manslaughter. The trial court instructed the jury as follows: "If you find that the State has proved beyond a reasonable doubt all the essential elements of murder, your verdict must be guilty." August 2011 Trial Tr. at 769; *see also* Jury Charge at 13. Megan claims that, even if her conduct amounted to murder, the jury still had to consider whether the mitigating elements of voluntary manslaughter were present. According to Megan, by instructing the jury that it must find Megan guilty if the elements of murder were satisfied, the trial court prevented the jury from considering the mitigating elements of voluntary manslaughter.

{¶46} "Voluntary manslaughter is an inferior degree of murder." *State v. Alexander*, 4th Dist. No. 08CA3221, 2009-Ohio-1401, ¶ 62; *accord State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).

> A defendant on trial for murder or aggravated murder
> bears the burden of persuading the fact finder, by a
> preponderance of the evidence, that he or she acted

under the influence of sudden passion or in a sudden

fit of rage, either of which was brought on by serious

provocation occasioned by the victim that was

reasonably sufficient to incite the defendant into using

deadly force, R.C. 2903.03(A), in order for the

defendant to be convicted of voluntary manslaughter

rather than murder or aggravated murder.  *State v.*

*Rhodes*, 63 Ohio St.3d 613, 590 N.E.2d 261 (1992),

syllabus.

**{¶47}**  Additionally, when a voluntary manslaughter instruction is appropriate, a

trial court should instruct the jury "to consider the mitigating evidence to determine

whether [the defendant] proved voluntary manslaughter."  *State v. Benge*, 75 Ohio St.3d

136, 140-141, 661 N.E.2d 1019 (1996).

**{¶48}**  We will assume that the trial court's instruction prevented the jury from

considering the voluntary manslaughter charge.  However, "[i]t is axiomatic that in order

for there to be reversible error, there must be prejudice to the appellant."  *State v.*

*Rembert*, 5th Dist. No. 04 CA 66, 2005-Ohio-4718, ¶ 15, citing *State v. Dean*, 94 Ohio

App. 540, 16 N.E.2d 767 (1st Dist.1953); *Tingue v. State*, 90 Ohio St. 368, 108 N.E. 222

(1914).

**{¶49}**  Here, Megan cannot demonstrate prejudice because the evidence at trial

did not warrant a voluntary manslaughter instruction.  This is so because there was no

subjective evidence that Megan killed William while she was under the influence of

sudden passion or in a sudden fit of rage.  Therefore, Megan cannot show that she was

prejudiced if the trial court's murder instruction prevented the jury from considering the voluntary manslaughter instruction.

{¶50}  As indicated above, a voluntary manslaughter instruction requires both objective and subjective evidence.  First, there must be "evidence of reasonably sufficient provocation occasioned by the victim * * * to warrant such an instruction." *Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272, paragraph one of the syllabus.  "In making that determination, trial courts must apply an objective standard: 'For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control.'"  *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 81, quoting *Shane* at 635.

{¶51}  If the objective component is met, "the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage."  *Shane* at 634.

{¶52}  When analyzing the subjective component, "evidence supporting the privilege of self-defense, *i.e.*, that the defendant feared for [her] own and [others'] personal safety, does not constitute sudden passion or a fit of rage as contemplated by the voluntary manslaughter statute."  *State v. Harris*, 129 Ohio App.3d 527, 535, 718 N.E.2d 488 (10th Dist.1998).  "While self-defense requires a showing of fear, voluntary manslaughter requires a showing of rage, with emotions of 'anger, hatred, jealously, and/or furious resentment.'"  *State v. Levett*, 1st Dist. No. C-040537, 2006-Ohio-2222, ¶ 29, quoting *State v. Perdue*, 153 Ohio App.3d 213, 2003-Ohio-3481, 792 N.E.2d 747, ¶ 12 (7th Dist.), in turn quoting *Harris* at 535; *accord State v. Sudderth*, 4th Dist. No.

07CA38, 2008-Ohio-5115, ¶ 14; *see also Hendrickson*, 2009-Ohio-4416, at ¶ 45-46; *State v. Caldwell*, 10th Dist. No. 98AP-165, 1998 WL 890232, *7 (Dec. 17, 1998).

**{¶53}** Here, the evidence at trial did not satisfy the subjective prong of the voluntary manslaughter test. Even assuming there was evidence of circumstances sufficient to arouse the passions of an ordinary person beyond the power of his or her control, there was no evidence that Megan was actually under the influence of sudden passion or in a sudden fit of rage. Instead, the subjective evidence consisted of Megan's fear of William. That is, the evidence at trial supported a self-defense theory, not a voluntary manslaughter theory.

**{¶54}** Megan repeatedly testified that she feared William, but there was no evidence that Megan killed William in an act of sudden passion or in a fit of rage. Megan testified that she did not return to the residence after leaving in January 2006 because she "was afraid to" return. August 2011 Trial Tr. at 382. Megan stated that, during the time leading up to the incident, she grew "progressively scared." *Id.* at 467. She also claimed that William's threat to kill the children on March 20 caused her to be "very scared." *Id.* at 473. Additionally, Megan testified that, just before she shot William, she observed that he had something "that made [her] uncomfortable." *Id.* at 485. The evidence at trial shows that Megan actually observed William's cell phone, but her testimony implies that she thought it might have been a firearm. Finally, Megan testified that when she shot William she had "an honest belief that he was going to kill [her]." *Id.* at 496.

**{¶55}** Dr. Bobby Miller is a psychiatrist who testified that Megan suffered from battered woman's syndrome. Dr. Miller's testimony indicated that Megan feared

William.  For example, in December 2005, Megan took a vacation without William. Apparently, William objected to the trip, and Dr. Miller testified that Megan expressed a "morbid fear" as to the consequences she would face when she returned.  *Id.* at 570. Dr. Miller also testified that, in early 2006, there were changes occurring within Megan and William's marriage that made William's behavior less predictable.  Dr. Miller testified that this unpredictability "sent [Megan] into a panic."  *Id.* at 573.  After Megan left with the children in January, William had apparently learned where she and the children were staying.  Dr. Miller testified that this also "created a sense of panic" in Megan.  *Id.* at 586.  Finally, Dr. Miller testified that his professional opinion was as follows: "At a time [sic] of the alleged offense as a consequence of [Megan's] being a victim of marital abuse she had reason to believe and reasonably believed that she and her children were in eminent [sic] danger of death or serious physical injury."  *Id.* at 595.

{¶56}  Thus, the subjective evidence at trial supports a theory that Megan feared William.  There is no evidence, however, that Megan actually was under the influence of sudden passion or in a sudden fit of rage when she shot William.  Consequently, the evidence at trial did not support a manslaughter conviction.  As a result, even if the trial court's murder instruction precluded the jury from considering the voluntary manslaughter charge, Megan cannot demonstrate that she was prejudiced by the alleged error.

{¶57}  Accordingly, we overrule Megan's fourth assignment of error.

VI.

{¶58} In her fifth assignment of error, Megan argues that the trial court erred by denying her motion to disqualify. Megan moved to disqualify both the Lawrence County Prosecutor's Office and Det. Bollinger.

{¶59} Appellate courts review a motion to disqualify under an abuse of discretion standard. *Ross v. Olsavsky*, 7th Dist. No. 09 MA 05, 2010-Ohio-1310, ¶ 40; *see also State v. White*, 8th Dist. 82066, 2004-Ohio-5200, ¶ 24.

{¶60} In her motion to disqualify, Megan argued that the trial court should disqualify Det. Bollinger as a witness based on his relationship with Samantha Fields, who was one of Megan's former attorneys. Megan's motion, however, did not directly implicate any members of the Lawrence County Prosecutor's Office.

{¶61} "The mere appearance of impropriety is insufficient to warrant [] disqualification * * *." *White* at ¶ 25. A motion to disqualify should be granted only "when actual prejudice is demonstrated." *Id.* at ¶ 26. "Prejudice will not be presumed by an appellate court where none is demonstrated." *Id.*

{¶62} As stated above, Megan was convicted of murder following her first trial, which occurred in April 2007. Megan appealed that conviction. We affirmed Megan's conviction, but the Supreme Court of Ohio reversed our decision. Fields was an associate attorney with a law firm that represented Megan in her first trial. Fields's employment with the firm lasted from October 2005 until October 2006. Thus, Fields's employment with that firm ended prior to Megan's first trial. Nevertheless, Fields was employed with the firm when it represented Megan in connection with William's death.

{¶63} Fields and Det. Bollinger began dating in July 2007, after the conclusion of Megan's first trial. And in April 2009, Fields married Det. Bollinger.

{¶64} The trial court held a hearing on Megan's motion to disqualify, and the evidence at the hearing shows that Megan was not prejudiced by Fields's relationship with Det. Bollinger. Fields acknowledged that she had access to Megan's files while she worked at the firm. Fields also testified that she had a couple of conversations with Megan when Megan was in jail awaiting trial. Following one of those conversations, Fields took some of Megan's handwritten notes from the jail to the firm. Fields testified that she did not know the content of those notes. Fields also stated that she did not do legal research on Megan's case. Additionally, Fields testified that she did not have conversations with any partners at the firm regarding how Megan's trial would be conducted. Moreover, Fields did not recall overhearing any such conversations. The trial court specifically inquired of Fields as follows: "But you did not have any discussion or strategy or anything of that nature or help in the case preparation of discuss [sic] any of that with your partners in the murder case?" July 22, 2011 Pretrial Tr. at 49. Fields responded, "No I did not your Honor." *Id.*

{¶65} There was a discrepancy between Fields's testimony and Det. Bollinger's testimony. This discrepancy, however, does not demonstrate prejudice. Fields testified as follows regarding conversations she had with Det. Bollinger about Megan's case:

> Q. Okay, and during that time did you have
>
> conversations [with Det. Bollinger] concerning what
>
> was happening to Megan Goff?
>
> A. We had some conversations about the appeal
>
> process and what the status of the appeal was.

Q. Did you have conversation [sic] when the appeal in the Fourth District was affirmed?

A. Yes.

Q. Did you have further conversations after the Supreme Court of Ohio reversed the decision?

A. Yes, just as to the status of that ruling. July 22, 2011 Pretrial Tr. 46.

{¶66} In contrast, Det. Bollinger testified as follows:

Q. So you were, you were married at the time this Megan Goff case was going through appeal?

A. Through appeal yes.

Q. And you had discussions with your wife regarding that case?

A. No Mam.

Q. You never discussed that case?

A. No Mam.

Q. You were married to your wife when this Megan Goff case was reversed by the Ohio Supreme Court?

A. Yes.

Q. In December 2010?

A. Yes.

Q. And you had discussions then with your wife regarding this matter?

A.  I don't discuss legal cases.  I don't even know who

my wife represents on cases.  We don't work any

cases, she doesn't defend anyone on cases that I

work, just not our topic of conversation at home.  *Id.*

at 53-54.

**{¶67}**  Even assuming the discrepancy between Fields's testimony and Det. Bollinger's testimony creates the appearance of impropriety, the discrepancy does not demonstrate prejudice sufficient to warrant disqualification.  At most, the testimony shows that Fields and Det. Bollinger discussed the status of Megan's appeal following her first trial.  There is no indication, however, that Fields divulged any information to Det. Bollinger that could have disadvantaged Megan's defense.  Thus, Megan has not demonstrated that Fields's relationship with Det. Bollinger prejudiced Megan's ability to receive a fair trial.

**{¶68}**  Because Megan cannot show that she was prejudiced by Fields's relationship with Det. Bollinger, the trial court did not abuse its discretion when it denied her motion to disqualify Det. Bollinger and the Lawrence County Prosecutor's Office.

**{¶69}**  Accordingly, we overrule Megan's fifth assignment of error.

**{¶70}**  In conclusion, having overruled all of Megan's assignments of error, we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

Harsha, J., concurring:

{¶71} I concur in judgment and opinion on the second and fifth assignment of error but concur in judgment only on the first, third and fourth assignments of error. The principal opinion correctly cites *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 72; *State v. Mitts*, 81 Ohio St.3d 223, 228; and *State v. Wolons*, 44 Ohio St.3d 64, paragraph two of the syllabus, as holding the trial court is vested with discretion to determine whether the evidence warrants a requested jury instruction. However, the Supreme Court of Ohio has also held that requested instructions should be given if they are correct statements of the law applicable to the facts in the case and reasonable minds might reach the conclusion sought by the instruction. *Murphey v. Carrollton Mfg., Co.* (1991), 61 Ohio St.3d 585, 591. In *Murphey* the court went on to declare "In reviewing the record to ascertain the presence of sufficient evidence to support the giving of a[n] * * * instruction, an appellate court should determine whether reasonable minds might reach the conclusion sought by the instruction." *Id.* And in *State v. Comen* (1990), 50 Ohio St.3d 206, paragraph two of the syllabus, the court held " * * * a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." These directives indicate *de novo* review, not the abuse of discretion standard posited in *Fulmer*, *Mitts*, *Wolons* and the principal opinion.

{¶72} I realize one can justify using the latter standard by assuming *Fulmer* has overruled *Murphey sub silentio*. But in light of the inconsistency between the two lines of cases, the fact that *Murphey* and *Comen* have not been overruled, limited, or clarified, I continue to believe that the more appropriate standard of review remains *de*

*novo.* See *Murphey* (Harsha, J., concurring in judgment and opinion), and *State v. Powell*, 4th Dist. No. 00CA2562, 2002-Ohio-6158, ¶ 24.

{¶73} Finally, looking to the fourth assignment of error, I conclude there was no error because the evidence did not warrant instructions on involuntary manslaughter and the jury's duty to consider mitigating evidence. In other words, I believe the jury instruction was correct as given, rather than being erroneous but not prejudicial as the principal opinion concludes.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED.  Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Abele, J.:   Concurs in Judgment & Opinion.
Harsha, J:   Concurs in Judgment & Opinion as to A/E II & A/E V.
                     Concurs in Judgment Only as to A/E I, III, & IV, with Opinion.


                                   For the Court


                                   BY:_____
                                        Roger L. Kline, Judge


### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**