JOURNAL ENTRY and OPINION
{¶ 1} Appellant Merita White appeals her conviction and sentence and assigns the following errors for our review:[1]
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} The State charged Merita White with taking $150,000 from Mattie Cunningham, a paraplegic. The charges consisted of theft with a disabled victim provision and perjury. After the jury trial, the trial court sentenced White to seven years in prison. The State presented several witnesses to establish its theory that White, a minister of Grace Apostolic Church, used her relationship with her parishioner Cunningham, to obtain the money as a loan with knowledge that she did not plan to repay the amount. The jury rejected White's argument that the money was a gift.
 {¶ 4} The facts showed Cunningham approached White regarding the availability of someone to act as a care giver for her and her three minor children. White had operated a home health care service and informed Cunningham she could provide someone at ten dollars an hour. Cunningham informed White she anticipated settling a pending medical malpractice suit for one million dollars, which malpractice had resulted in her becoming a paraplegic. Cunningham told White that she anticipated her share after cost and fees would be placed in an annuity.
 {¶ 5} Cunningham testified at the trial that White told her not to trust her lawyer and to obtain the amount in a lump-sum payment. Cunningham did approach her lawyer Martin Sandel, who also testified for the State, regarding the lump-sum payment. He advised against this approach. White, however, told Cunningham to insist, which she did.
 {¶ 6} Cunningham stated shortly after she received the lump-sum payment, White told her she was house-hunting. Cunningham told White she too wanted to buy a house. A few days later, White told Cunningham about a house she had seen that would be ideal for her. The house was on Monticello Boulevard in Cleveland Heights very close to the one White had found for herself.
 {¶ 7} After Cunningham saw the house, White began talking with her about the house she wanted to purchase. These conversations occurred almost daily. Finally, one day Cunningham inquired why White's house purchase was taking so long. White told her parishioner Hoover White was trying to obtain a loan for her, but was having difficulty. Cunningham stated she would be willing to assist her with $10,000 or $15,000 and inquired if that would be enough. Cunningham stated "she kind of sniggled a little bit, a little sniggle, she said `no Sister Cunningham, it's going to take a whole lot more than that.'" When Cunningham asked White how much it would take, she said about $150,000. Cunningham told her that was a lot of money. White informed Cunningham she needed to have faith in God and to learn to think like a millionaire.[2]
 {¶ 8} Later that same day, White told her she would reduce the agreement to writing, which would make the agreement legal. White assured Cunningham she would never do anything to hurt her and told her not to tell her family, because they were not "saved" and would not understand[3]
 {¶ 9} Cunningham stated White promised to repay her within two months from proceeds of a loan she anticipated obtaining. Though they did not set a definite date, she would be paid back at the beginning of 2000.
 {¶ 10} Thereafter, Cunningham wrote two personal checks to White, one for the house and the other for the church's utility bills and the baptismal fountain. The following day, White returned to Cunningham with the checks and asked Cunningham to make the checks payable to the church. Further, White asked Cunningham to get a cashier's check instead. Cunningham then went to her bank, obtained a cashier's check and gave it to White. Again, White cautioned Cunningham not to tell anyone about the loan.
 {¶ 11} Cunningham stated the next time she attended Grace Apostolic Church after giving White the check, White announced from the pulpit that Cunningham had been a blessing to the church. Cunningham said White asked her to stand and the congregation applauded.
 {¶ 12} As the time for repayment approached, Cunningham asked White about the loan, and White assured her the loan was being processed and she would be repaid soon. However, as more time passed, Cunningham became anxious about the return of her money and pressed White about the loan. Finally, White told Cunningham she felt deceived and she thought the money was a gift to the church, and not a loan to her. Thus, she did not think she had to repay her.[4]
 {¶ 13} Martin Sandel testified on June 5, 2000. Cunningham contacted him and explained what had transpired between her and White. He then filed suit against White alleging she used her position as a pastor to manipulate Cunningham, thereby stealing her money. He stated during discovery he could not find the Board of Brothers that White claimed was helping her to find a house, nor could he find any minutes of the meetings.
 {¶ 14} He stated, prior to trial, White signed a consent judgment agreeing to the allegation and to repay Cunningham the money she received within two months. Further, she agreed to pay an additional $40,000 provided she had not repaid Cunningham by the end of two months.
 {¶ 15} Sandel stated during the two month period he met several times with White's attorney in an effort to get her to deed the house she bought to Cunningham, but she refused. At the end of the two months, White still had not paid and Cunningham foreclosed on the house. However, a few days before the foreclosure sale, White filed a notice of Chapter 13 Bankruptcy, which stayed the sale. White then had thirty days to file a reorganization plan with the bankruptcy court. White failed to file the plan, the bankruptcy was dismissed and Cunningham again instituted foreclosure proceedings. Just prior to the second attempt of the foreclosure sale, White again filed notice of Chapter 13 Bankruptcy, which again stayed the sale. That bankruptcy was also dismissed. Thereafter, Cunningham petitioned the court not to allow White to file another bankruptcy petition unless it was done in good faith. After all the testimony, the State rested.
 {¶ 16} White testified she has been the pastor of Grace Apostolic Church since 1983. The church has approximately two hundred members with an average of thirty-five-to-fifty attending on a weekly basis.
 {¶ 17} She said Cunningham first visited the church in the early 1980's and eventually became a member. However, Cunningham later left the church and had no contact with her until 1996 when the hospital called her to administer Cunningham's last rites. She said after Cunningham came out of the coma, she and the other church members would visit Cunningham in the hospital. White again lost contact with Cunningham after she was discharged from the hospital.
 {¶ 18} White said Cunningham contacted her in the early part of 1999 seeking help in finding someone to take care of her and her children. White arranged for her sister to provide assistance to Cunningham at the rate of ten dollars per hour. She stated they provided the service even though Cunningham had no money to pay. She said during this time Cunningham began attending the church again.
 {¶ 19} According to White, in October 1999, Cunningham called her at home and told her she had become tired of White always talking about the church's past due utility bills. She offered to bring them current and also to donate money to build a baptismal fountain. It was in this conversation that Cunningham asked about the house the church had resolved to buy for her. White explained what the church was trying to do about purchasing the house. Thereafter, Cunningham issued a check for $160,000 made out to White personally. White then asked her to reissue the check in the name of the church and she did so. Thereafter, White announced from the pulpit that Cunningham was donating a large sum of money to the church and was a blessing to the church.
 {¶ 20} However, a few weeks later, Cunningham called her and told her she wanted her money back because she had lost the case against St. Alexis Hospital and the Emergency Room Group. White told her she no longer had the money. She had paid the church's utility bills, installed the baptismal pool, and purchased the house. The defense rested after presenting its case.
 {¶ 21} On September 10, 2002, the jury returned guilty verdicts on both counts of the indictment. Thereafter, on October 8, 2002, the trial court sentenced White to a period of seven years on count one and five years on count two with the sentences to be served concurrently. White subsequently motioned the court for a new trial, which the court denied. White now appeals.
 {¶ 22} At the outset, note that several of the assignments of error set forth in White's brief do not cite any authority. It is axiomatic that the failure to cite case law or statutes in support of an argument, as required by App.R. 16(A)(7), constitutes grounds to disregard the assigned error pursuant to App.R. 12(A)(2).[5] Consequently, we disregard assigned errors five through nine.
 {¶ 23} We also strike assigned error two from this appeal. Assigned error two concerned the conviction and the sentence journalized on October 18, 2002, which involved the trial court's refusal to grant a new trial. The denial of this motion for new trial was post-judgment and required a separate notice of appeal from the journal entry dated October 18, 2002. White failed to seek a separate appeal from that entry; thus, it is stricken. Pursuant to App.R. 4, an appeal must be taken within thirty days of the date of the judgment or order appealed therefrom. Without the timely filing of a notice of appeal, an appellate court is without jurisdiction to hear the appeal.[6]
 {¶ 24} In White's first assigned error, she argues the trial court abused its discretion in denying the motion to disqualify the Cuyahoga County Prosecutor's Office from prosecuting the case. White argues Assistant Prosecutor Aaron Phillips represented her prior to her indictment. Consequently, the prosecutor's office is precluded from prosecuting because of a conflict of interest. We disagree.
 {¶ 25} When reviewing an allegation of a prosecutor's misconduct or disqualification, the reviewing court must review the matter on a case-by-case basis.[7] The mere appearance of impropriety is insufficient to warrant the disqualification of an entire prosecutor's office.
 {¶ 26} A decree disqualifying a prosecutor's office should only be issued by a court when actual prejudice is demonstrated. In making the determination, relevant factors may include: 1) the type of relationship the disqualified prosecutor previously had with a defendant, 2) the screening mechanism, if any, employed by the office, 3) the size of the prosecutor's office, and 4) the involvement the disqualified prosecutor had in the case.[8]
Prejudice will not be presumed by an appellate court where none is demonstrated.[9]
 {¶ 27} The record reveals when White informed Cunningham she was not going to repay the money, claiming it was a gift to the church, a meeting was convened at Cunningham's house to resolve the issue. The meeting was attended by White, Cunningham, a loan officer, and attorney Aaron Phillips, who was also an associate pastor at White's church. However, nothing was resolved and Cunningham filed a civil suit against White, Reginald Nickerson, and the Church. Attorney Phillips then referred White to Attorney Butler.
 {¶ 28} The record does not indicate Phillips was ever the attorney of record for White, but reflects he represented Nickerson in the civil suit. Additionally, affidavits from Paul Soucie, supervisor of the Economic Crime unit of the Cuyahoga County Prosecutor's Office, and Dan Kasaris, a member of that unit, indicate there are more than 150 Assistant Cuyahoga County Prosecutors and the office has within it at least 10 separate units which handle their own criminal case load. Additionally, White's case was assigned to the Economic Crime Unit. More importantly, Phillips was not assigned to that unit, did not have access to any files, was not involved in any of the unit's files, and had not seen Merita White's file.
 {¶ 29} Based on the evidence presented at trial, we conclude no prejudice was demonstrated as a result of Phillips' involvement in the civil case, and consequently, the trial court did not abuse its discretion in denying White's motion to disqualify the Cuyahoga County Prosecutor's Office. Accordingly, we overrule White's first assigned error.
 {¶ 30} In White's second assigned error, she argues the trial court abused its discretion in not granting a new trial based on newly discovered evidence of Phillips' arrest on February 14, 2003. She claims the arrest showed Phillips was charged with accepting illegal payments allegedly to influence criminal cases. We disagree.
 {¶ 31} A new trial may be granted on a motion of the defendant for any of the causes materially affecting his substantial rights.[10] The decision to grant or deny a motion for a new trial on the basis of newly discovered evidence is within the sound discretion of the trial court and, absent an abuse of discretion, that decision will not be disturbed.[11] Likewise, the trial court's decision on whether the motion for a new trial warrants a hearing will not be disturbed on appeal absent a clear showing that the court abused its discretion.[12]
 {¶ 32} To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.[13]
 {¶ 33} In addition, the newly discovered evidence must be of such weight that a different result would be reached at the second trial.[14] Unless the court finds that a different verdict would be reached, a motion for a new trial based on newly discovered evidence should not be granted.
 {¶ 34} Here, White argues the trial court was required to conduct an evidentiary hearing on her motion for new trial to determine the merits of her newly discovered evidence; that is, Phillips' arrest. Despite White's belief, such an evidentiary hearing is discretionary and not mandatory. There is no evidence that the trial court abused its discretion or held a bias or prejudice against White when it failed to hold an evidentiary hearing on White's motion for new trial.
 {¶ 35} Moreover, White's newly discovered evidence does not warrant a new trial because White does not meet all of the six factors required in Petro. We look at the first factor only. At the outset, we note Phillips' arrest had nothing to do with whether White was guilty of theft and perjury. Phillips' arrest and the charges against him do not disclose a strong probability that White is innocent. White's guilt turned on her taking money from Cunningham with no means to repay, as well as the jury's rejection of her claim that the money was a gift. Consequently, White's argument does not meet the first Petro-factor. Accordingly, we overrule White's second assigned error.
 {¶ 36} In the third assigned error, White argues the trial court erred when it overruled her Crim.R. 29 motion to dismiss. We disagree. A motion for a judgment of acquittal is properly denied when reasonable minds can reach different conclusions as to whether each material element of a crime had been proved beyond a reasonable doubt.[15] White essentially argues the evidence was insufficient to support her conviction for theft and perjury.
 {¶ 37} A challenge to the sufficiency of evidence supporting a conviction requires the appellate court to determine whether the State met its burden of production at trial.[16] On review for legal sufficiency, the appellate court's function is to examine evidence admitted at trial and determine whether such evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt.[17] In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution.[18]
 {¶ 38} Our review reveals there was sufficient evidence to convict White of both theft and perjury. White maintains the money she received from Cunningham was a gift to the church because Cunningham admitted there was no promissory note, no mortgage deed, no disclosure statement, and no rate of interest evincing a loan. However, reasonable minds could have found this was a loan.
 {¶ 39} First, Cunningham testified as follows:
 {¶ 40} "Q. Did she understand it was a loan?
A. Yes.
 {¶ 41} How did she understand that?
 {¶ 42} Because I asked her how she was getting the money to pay for the house. She said she was getting the money through Hoover, which looked, looking for loans for people to get homes. So I asked her, did it work like when you get a house through a bank or something and other things we discussed about her helping my niece at one point get a loan through Hoover and them and if I didn't get my money in time, get my money through Hoover in time to get my house, different things we discussed, as far as different things about the loan, them, me getting the money, like if a person would if they was getting it from a bank if they were selling a home."[19]
 {¶ 43} The above exchange indicates Cunningham contemplated a loan to White, though the transaction was never reduced to writing. Cunningham did testify White in fact promised to put the agreement in writing, but never did. When asked why she did not make a notation on the check that it was a loan, Cunningham stated she did not know she could do that when using a cashier's check.
 {¶ 44} Second, White along with several other witnesses, testified White announced at church in front of the entire congregation that Cunningham had been a blessing to the church and she stood up and received applause. Noticeably absent from all the testimony is the amount of the blessing or gift to the church. Cunningham did make a gift of $10,000 to pay the past due balances on the church's utility bills and to build a baptismal fountain so she could be baptized. This $10,000 gift was very substantial in light of the fact the most the church ever received in tithes and offerings was $10,000.
 {¶ 45} Further, since the church had resolved to purchase a home for White, if Cunningham had made the resolution possible in the form of a gift, then at minimum, White should have announced that the church had accomplished this by virtue of a gift from Cunningham. Further, the average person would expect White, a pastor receiving such a substantial blessing from one parishioner, would elaborate and give more details. White failed to do so, which leads us to conclude the money was a loan and not a gift.
 {¶ 46} Third, having concluded the $150,000 White obtained was a loan from Cunningham, we turn our attention to White's ability to repay the loan. The record reveals White was supported solely by the congregation, who in the best years contributed a maximum of $10,000 in tithes and offerings. From this amount, the church had to be maintained and the record showed the church's utility bills were constantly in arrears, which White passed bad checks on several occasions in an attempt to pay. White did not have a place to stay, and was living with friends and relatives. Further, White could not obtain financing to purchase the house she claimed the church resolved to buy for her, because of poor credit.
 {¶ 47} We conclude the elements of theft were satisfied because at the time White obtained the loan from Cunningham, neither she nor the church had the ability to repay it. Thus, there was no intention to repay.
 {¶ 48} We now address the charge of perjury. The basis of the perjury charge was White's statement when deposed that a Board of Brothers of Grace Apostolic Church was helping her to purchase a house and that there were meetings where minutes were kept. However, the record reveals pretrial discovery did not produce any evidence of a Board of Brothers or minutes of any meetings. Further, Hoover White, one of the parishioners White claimed was on the Board of Brothers, testified as follows:
 {¶ 49} "Q. Was there a Board of Brothers set up by the church to find a house for pastor White?
A. Specifically for that reason?
 {¶ 50} Yes.
 {¶ 51} Not that I know of.
 {¶ 52} Q. Were you on a Board of Brothers that was created to help the pastor find a house?
A. Not specifically for that reason."[20]
 {¶ 53} Hoover White's testimony and the failure to find any evidence of the existence of a Board of Brothers, or minutes kept, sufficiently established White knowingly made false material statements, under oath or affirmation in an official proceeding. Consequently, the elements of perjury were established.
 {¶ 54} We conclude there was sufficient evidence presented to satisfy the elements of both theft and perjury. Thus, the trial court correctly denied White's motion for acquittal. Accordingly, we overrule White's third assigned error.
 {¶ 55} In the fourth assigned error, White contends the verdict is against the manifest weight of the evidence. We disagree.
 {¶ 56} Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of evidence.[21]
 {¶ 57} When an appellant challenges a conviction on manifest weight grounds, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, "and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."[22] The discretionary power to grant a new trial should be exercised only in exceptional cases in which the evidence weighs heavily against the conviction.[23]
 {¶ 58} Stated succinctly, a reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all elements of an offense have been proven beyond a reasonable doubt.[24]
 {¶ 59} Our discussion of the third assigned error indicated neither White nor the church had the financial ability to repay the money, and White knew this at the time the loan was made. Further, the evidence was uncontradicted that White committed perjury. We conclude there was sufficient credible evidence to determine White's guilt. Therefore, we cannot say the jury lost its way and created a manifest miscarriage of justice. Accordingly, we overrule White's fourth assigned error.
 {¶ 60} In the tenth assigned error, White contends counsel's preparation and performance was deficient. We disagree. In evaluating whether a defendant has been denied herSixth Amendment right to effective assistance of counsel, the ultimate query is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."[25]
 {¶ 61} In order to prevail on a claim of ineffective assistance of counsel, the petitioner must show trial counsel's performance fell below an objective standard of reasonableness and such performance resulted in undue prejudice.[26] In this regard, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumed competent.[27] An essential element of an ineffective assistance of counsel claim is a showing that, but for trial counsel's alleged errors, there is a substantial probability that the outcome of the trial would have been different.[28]
 {¶ 62} White set forth several instances to support the claim of ineffective assistance of counsel, two of which were raised in assigned errors five and seven. As previously noted, White failed to cite any case law in support of those assigned errors and this court is not obliged to address them.
 {¶ 63} White contends defense counsel's failure to call a number of witnesses on her behalf demonstrates ineffective assistance of counsel. However, a counsel's decision not to call a witness falls squarely within the ambit of trial strategy and does not constitute ineffective assistance absent a showing of prejudice.[29]
 {¶ 64} The cumulative effect of the perceived errors is not "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment.[30]
Consequently, we overrule White's tenth assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Corrigan, A.J., and Rocco, J., Concur.
 APPENDIX ASSIGNMENTS OF ERROR
"I. The trial court abused its discretion to the prejudice of the defendant by denying the defendant's motion to disqualify the Cuyahoga County prosecutor's office from prosecuting the case."
"II. The trial court abused its discretion by denying the defendant's motion for a new trial and by not having a hearing on the motion."
"III. The trial court erred to the prejudice of the appellant when it overruled his [sic] motion to dismiss pursuant to Crim.R. 29 where the state had failed to prove the required elements of theft and/or perjury."
"IV. The verdict is against the manifest weight of the evidence."
"V. The trial court erred to the prejudice of the defendant when it allowed the State to introduce testimony and documents (and allowed them to be admitted as exhibits) which were irrelevant and prejudicial including the civil complaint, foreclosure proceedings and bankruptcy proceedings."
"VI. The trial court abused its discretion when it allowed the State to introduce the defendant's deposition through testimony of Martin Sandel and when it allowed the deposition to be admitted as an exhibit."
"VII. The trial court erred to the prejudice of the defendant when it failed to instruct the jury, as requested by defense counsel, and agreed to by the State, that for the theft charge the State had to prove that at the time of the exchange of money that the defendant did not have a good faith intent to repay the alleged loan."
"VIII. The trial court abused its discretion when it precluded the defense from introducing, through Richard Nickerson, the resolution passed by the Board of Ministers that they help the defendant obtain a house."
"IX. The trial court abused its discretion when it allowed the prosecution to impeach the defendant concerning bad checks that she had allegedly written in the years 1999 and 2000."
"X. The preparation and performance of appellant's trial counsel was deficient and prejudiced appellant in such a way as to violate the appellant's rights as guaranteed by the Sixth,Eighth, and Fourteenth Amendments to the United States Constitution."
[1] See Appendix.
[2] Tr. at 273.
[3] Tr. at 274.
[4] Tr. at 293.
[5] Meerhoff v. Huntington Mtge. Co. (1995),103 Ohio App.3d 164, 169; State v. Riley (Dec. 29, 1998), Vinton App. No. 98CA518; Hiles v. Veach (Nov. 20, 1998), Pike App. No. 97CA604.
[6] Bosco v. Euclid (1974), 38 Ohio App.2d 40.
[7] See State v. Waggaman (Aug 20, 1997), Medina App. No. 96-CA-0078; State v. Bryant (June 26, 1997), Meigs App. No. 96-CA-14; State v. Hiatt, 120 Ohio App.3d 247; State v. Luna
(Sept. 2, 1994), Huron App. No. H-93-24; State v. Perotti (May 15, 1991), Scioto App. No. 89-CA-1845; State v. Faulkner (Aug. 20, 1990), Preble App. No. CA89-04-007; State v. Jacobs (Jan. 3, 1990), Summit App. No. 14089.
[8] State v. Vidu (July 23, 1998), Cuyahoga App. Nos. 71703 
71704.
[9] State v. Freeman (1985), 20 Ohio St.3d 55,485 N.E.2d 1043.
[10] Crim.R. 33(A)(6).
[11] State v. Hawkins (1993), 66 Ohio St.3d 339, 350, citingState v. Petro (1947), 148 Ohio St. 505, syllabus. See, also,State v. Shepard (1983), 13 Ohio App.3d 117, 119.
[12] Toledo v. Stuart (1983), 11 Ohio App.3d 292, 293.
[13] State v. Petro (1947), 148 Ohio St. 505.
[14] Shepard, 13 Ohio App.3d at 118.
[15] State v. Nelson (Feb. 25, 1999), Cuyahoga App. No. 73289, citing State v. Beaver (1997), 119 Ohio App.3d 385, 390, appeal dismissed (1997), 79 Ohio St.3d 1504.
[16] State v. Thompkins (1997), 78 Ohio St.3d 380.
[17] Id.; State v. Fryer (1993), 90 Ohio App.3d 37.
[18] Id. at 43.
[19] Tr. at 278-279.
[20] Tr. at 344.
[21] State v. Thompkins, supra.
[22] State v. Martin (1983), 20 Ohio App.3d 172,175, citingTibbs v. Florida (1982), 457 U.S. 31, 38, 42. See, also, Statev. Thompkins, supra.
[23] Martin, citing Tibbs. See, also, State v. Thompkins,
supra.
[24] State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus; State v. Eley (1978), 56 Ohio St.2d 169, syllabus.
[25] State v. Hester (1976), 45 Ohio St.2d 71, paragraph four of the syllabus.
[26] State v. Madrigal (2000), 87 Ohio St.3d 378, 397, reconsideration denied (2000), Ohio St.3d 1428, citingStrickland v. Washington (1984), 466 U.S. 668, 687; State v.Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990), 497 U.S. 1011.
[27] State v. Calhoun (1999), 86 Ohio St.3d 279.
[28] State v. Lindsey (2000), 87 Ohio St.3d 479, 489, reconsider-ation denied (2000), 88 Ohio St.3d 1438.
[29] State v. Oliver (1995), 101 Ohio App.3d 587; State v.Williams (1991), 74 Ohio App.3d 686.
[30] State v. Smith (1997), 80 Ohio St.3d 89, 112, citingStrickland, 466 U.S. at 687.