[Cite as *State v. Fester*, 2021-Ohio-410.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2019-05-043 |
| | : | O P I N I O N |
| - vs - | | 2/16/2021 |
| | : | |
| CYNTHIA ANN FESTER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2018 CR 000789

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton, 76 South Riverside Drive, 2nd Floor, Batavia, Ohio 45103, for appellee

William J. Rap Law Offices, Joshua R. Crousey, One East Main Street, Amelia, Ohio 45102, for appellant

**HENDRICKSON, P.J.**

{¶1} Appellant, Cynthia Ann Fester, appeals from her convictions in the Clermont County Court of Common Pleas for trafficking in marijuana and possession of marijuana. For the reasons set forth below, we affirm her convictions.

{¶2} In September 2017, the Clermont County Narcotics Unit ("CCNU") began surveilling appellant's home on Harrison Woods Court in Clermont County, Ohio following

a tip of drug activity. The surveillance revealed numerous vehicles coming and going from the home and people entering the residence with empty bags and suitcases, only to exit the home a short time later with full bags and suitcases. From September 2017 through the end of January 2018, law enforcement observed more than 50 people visiting appellant's home. Among those observed multiple times at appellant's home were Ken Ung Ly ("Ken Ly"), Linda Malin, Kendra Hollis, Joshua Plummer, and appellant's two sons, Bryan Fester and Zach Fester. To law enforcement, the activity at appellant's house was indicative of a large drug operation.

{¶3} Law enforcement began surveilling other residences and businesses where appellant, Bryan, Ken Ly, and Plummer were often observed. Law enforcement also began to monitor the many vehicles that were owned and registered to appellant but were often driven by others. A GPS tracker was placed on a 2012 Cadillac Escalade that was in appellant's name but was primarily driven by Bryan. Appellant also had a 2010 Lexus IS250 and a 2005 Nissan Altima that were in her name. Though multiple people were observed driving the Altima, the Lexus was driven almost exclusively by appellant. Appellant had given Bryan access to her vehicle, however, as he was seen moving the vehicle in and out of the garage at appellant's residence.

{¶4} From their investigation, law enforcement was able to determine that Bryan was bringing in large amounts of marijuana through Ken Ly and his brother, Nhat Ly. Ken Ly resided in California and would visit appellant's home every two or three weeks, often staying at appellant's home or Bryan's home when he came to Ohio. Bryan was also known to have made multiple trips to California.

{¶5} From November 2, 2017 through December 12, 2017, appellant was in Guam visiting her third son. During this time, Bryan, Ken Ly, and other associates were seen coming and going from appellant's home with bags and suitcases.

{¶6} In January 2018, Bryan went to California with his girlfriend, his children, appellant, and Zach. Though everyone flew to California, appellant and Zach drove a rental car back to appellant's Clermont County home. Bryan asked appellant and Zach to drive two suitcases back to Ohio, claiming he did not want to pay an $85 bag fee to have them flown to Ohio. One of the suitcases appellant drove back to Clermont County was a pink suitcase. This same suitcase was often seen going in and out of appellant's residence and Bryan later admitted to law enforcement that he used the suitcase to transport and hold marijuana.

{¶7} On January 21, 2018, appellant was observed at Malin's apartment building in the vehicle she rented to drive back to Ohio from California. Bryan was also observed at this address, although he had arrived in a separate vehicle. Two suitcases, one of which was a pink suitcase, were removed from the rental vehicle and rolled over to Bryan's vehicle. Shortly thereafter, Bryan returned the suitcases to the rental vehicle and both the rental vehicle and Bryan's vehicle were driven to appellant's home. The suitcases were removed from the rental vehicle and taken into appellant's home.

{¶8} Officers conducted a trash pull at appellant's home on January 21, 2018 and found an empty vial with "THC 75.2 percent pure" written on it. Officers also found mail addressed to appellant and to Bryan. From January 22, 2018 through January 29, 2018, law enforcement continued to observe "a lot of traffic in and out" of appellant's residence, with individuals carrying suitcases, duffle bags, and backpacks into and out of the home.

{¶9} On January 29, 2018, law enforcement followed a white minivan containing Ken Ly and two other unidentified individuals to the Pacific Kitchen, a restaurant in Montgomery, Ohio that Ken Ly's brother owned. The minivan was parked next to an Acura. Four large, white boxes were loaded into the minivan. Two suitcases were taken from the minivan and placed in the Acura. The two unidentified individuals entered the Acura and

drove away.  Ken Ly drove the minivan to appellant's residence, where the four large boxes were unloaded into appellant's home.

{¶10}  On January 31, 2018, law enforcement executed multiple search warrants in Clermont County, Butler County, Hamilton County, and in Northern Kentucky at residences and businesses believed to be involved in the drug operation that was run, in part, out of appellant's home.  Malin's apartment was searched and 120 pounds of marijuana and $70,000 was recovered.

{¶11}  Appellant's home was also searched pursuant to a warrant on January 31, 2018.  Officers who searched appellant's home testified that as soon as appellant's front door was opened, they immediately smelled a strong odor of marijuana.  Upon entering appellant's home, officers discovered an office immediately to the left.[1]  The door to the office was unlocked.  Inside the office, law enforcement located evidence related to drug trafficking.  Officers found the boxes that had been unloaded from Ken Ly's white minivan after they had been picked up at Pacific Kitchen on January 29, 2018.  Two of the boxes were unopened and each contained 30 vacuum sealed bags of marijuana.  A third box was already opened and had 34 vacuum sealed bags of marijuana.  The fourth box was empty. The marijuana found in the boxes weighed more than 125 pounds, or more than 40,000 grams.[2]  Also found in the office was the pink suitcase appellant had transported to Ohio from California.  Inside the pink suitcase were sealed bags of marijuana.  A tote bag found

---

1.  Testimony from trial indicated that appellant's home contained three bedrooms:  a master bedroom, a second bedroom located directly across from the master bedroom, and a third bedroom near the front door. The third bedroom was set up as an office.  For purposes of clarity, the third bedroom will be referred to as "the office" and the second bedroom across from the master bedroom will be referred to as the "spare bedroom."

2.  The marijuana contained in the boxes found in the office of appellant's home was sent to the Hamilton County Crime Lab.  Testing revealed that the marijuana found in the three boxes weighed, respectively, 17,334.6 grams, 15,035.1 grams, and 17,004.6 grams, for an aggregate weight of 49,374.3 grams.

in the office contained marijuana and dryer sheets and a file cabinet drawer held two bags of marijuana. In addition, vacuum seal bags, an envelope addressed to appellant, a currency counter, a digital scale, a Dickey's BBQ cup containing marijuana, a drug ledger, and additional dryer sheets were also found in the office.[3]

{¶12} In the hallway outside the office, officers found another drug ledger. In the kitchen and dining room of appellant's home, officers found marijuana in a cabinet, two vacuum sealers, a currency counter in the pantry, and a surveillance camera. In a spare bedroom located across from the master bedroom, the officers found a drug ledger, mail from Pacific Kitchen, a black bag containing $94,780 in currency, loose marijuana, packaging material, pre-rolled marijuana joints, luggage containing $49,870, and a checkbook belonging to Ken Ly. In appellant's master bedroom, officers found a surveillance camera, $20,000 in a file cabinet drawer, a drug ledger next to the bed on the floor, $1,969 in bundled currency in appellant's purse, $5,059.25 in a safe on the floor of appellant's closet, two iPhones, an AK-47 in the closet, a box of 9mm ammunition, and a plastic container containing $125 on the closet floor. When searching the trunk of appellant's Lexus, officers found reusable grocery bags. One of these bags had marijuana residue on the bottom of it.

{¶13} Law enforcement also obtained search warrants for appellant's bank accounts. Appellant had more than ten bank accounts, with varying amounts of money in each account. In one bank, appellant had a safety deposit box in which she stored vintage coins, silverware, and a bag with $25,040 in cash with "To Joshua Adam Plummer" written on it. In another bank, appellant had more than $44,000 in five accounts. Law enforcement's review of appellant's tax records from 2013 to 2016 indicated she earned

---

3. Trial testimony from law enforcement officers indicated that it was common for those involved in trafficking in marijuana to use dryer sheets in an effort to conceal the smell of the drug.

less than $20,000 during each of those years. Appellant, who was on disability due to a back injury, was employed as a PRN employee at a hospital, working a couple of times a week.

{¶14} When law enforcement entered appellant's home to search her residence, the officers found Ken Ly in the spare bedroom. Ken Ly and appellant were removed from the home and placed in police vehicles. Appellant was transported to the police station where she was interviewed by Agent Brian Taylor and Lieutenant Nic DeRose, officers on the CCNU. During the interview, appellant told Agent Taylor that she knew something was going on and that something was not right. She stated she did not want to get anyone in trouble and that she had been yelling at Bryan for a couple of weeks to "get it out" of her home. Appellant explained that Bryan paid her cellphone bill in exchange for the use of the office in her home.

{¶15} Agent Taylor informed appellant that a search had also been conducted at Malin's home and marijuana had been found at that location. Appellant stated that that made sense, as Bryan had her drop off suitcases there twice. When appellant was told by Agent Taylor that she was "in neck-deep" in the drug operation, appellant stated, "I know. I told you, I'm just stupid. I shouldn't have done anything. I'm so stupid."

{¶16} Following her interview, appellant was released from custody. On September 11, 2018, appellant was indicted on one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), a felony of the first degree, one count of trafficking in over 40,000 grams of marijuana in violation of R.C. 2925.03(A)(2), a felony of the second degree, one count of possession of over 40,000 grams of marijuana in violation of R.C. 2925.11(A), a felony of the second degree, one count of money laundering in violation of R.C. 1315.55(A)(1), a felony of the third degree, and possession of criminal tools in violation of R.C. 2923.24(A), a felony of the fifth degree. The trafficking in marijuana and possession

of marijuana offenses were accompanied by a specification seeking forfeiture of appellant's residence, three motor vehicles, an AK-47 firearm, and $195,593.99 in currency.

{¶17} Appellant pled not guilty to the offenses and a four-day jury trial commenced on April 29, 2019. The state dismissed the charges of engaging in a pattern of corrupt activity, money laundering, and possession of criminal tools. The state also dismissed appellant's residence from the forfeiture specification accompanying the trafficking in marijuana and possession of marijuana charges. Thereafter, the state presented testimony from law enforcement officers involved in the narcotics investigation and search of appellant's home, including testimony from Agent Taylor and Lt. DeRose. Appellant's recorded police interview and evidence obtained during the surveillance and search of appellant's home were admitted into evidence.

{¶18} Appellant, Bryan, and Malin testified in appellant's defense. Bryan admitted he had been incarcerated for running a drug organization. Bryan, a professional gambler, stated he became involved in the drug organization after meeting Nhat Ly at a casino in Cincinnati. Once Bryan's drug operation became too large for Nhat Ly, Nhat Ly involved his brother, Ken Ly. Bryan explained that he picked up marijuana at various restaurants in southwest Ohio and he would store the drugs at various places, including at Malin's and appellant's homes. The drugs were stored in boxes, suitcases, and bags – often with dryer sheets in an attempt to conceal the smell of the marijuana. Bryan explained that the pink suitcase found during the search of appellant's home was a suitcase that he used to hold bags of marijuana that were short product.

{¶19} Bryan testified that he largely worked out of the office in appellant's home, which he claimed to keep locked. However, Bryan claimed that when appellant went to Guam, he spread his drug operation outside the home-office. For instance, Bryan testified that he used the master bedroom to count more than $400,000 in cash and to balance his

drug ledgers and accounts. When he realized he had a $20,000 cash surplus, Bryan claimed he bundled the money up, stuck it in a cabinet drawer, and forgot about it until law enforcement found it in appellant's bedroom during execution of the warrant.

{¶20} Although Bryan denied that appellant was involved in his drug operation or even knew the operation was being run out of her home, he later contradicted himself by testifying that appellant had walked in on him once and told him to get his "stuff" out. Bryan claimed that the drugs in appellant's home did not smell, as they were packaged in vacuum-sealed bags. However, he also testified that appellant questioned him about why her home smelled like marijuana and he told her it was because he smoked a joint in the house. Bryan also contradicted himself when he first testified that he never weighed marijuana at appellant's house, but then stated that the Dickey's BBQ cup found at appellant's house was used to weigh marijuana. Bryan also claimed that appellant was never present when he sold marijuana to others, but surveillance video from January 21, 2018 shows appellant arriving home around the same time as Kendal Hollis, a known associate in Bryan's drug organization. Appellant walked into her home at the same time as Hollis, who was carrying an empty bag. A short time later, Hollis left the home with a full bag.

{¶21} Appellant took the stand and testified that she was unaware of and had not participated in Bryan's drug operation. Appellant claimed she did not know marijuana was being stored in her home or the drugs were being trafficked out of her home. Appellant offered explanations for the evidence recovered in her home and for the large sums of money found in her bank accounts. She claimed that money found in her various bank accounts was from a trust that she managed and from a $60,608 settlement she received in October 2017 after suffering injuries to her back. The $25,040 found in a safety deposit box inside a bag with Plummer's name on it was allegedly cash appellant had withdrawn for the purpose of buying a new car. As for the evidence collected in her home, she stated

that she has a vacuum sealer and vacuum sealer bags that she uses to keep her food fresh. She testified the iPhones recovered in her bedroom were for personal use – one phone was broken and the other phone was to replace the broken phone. As for the AK-47 found in her bedroom closet, appellant testified she bought the weapon for personal protection after an ex-boyfriend started stalking her.

{¶22} After considering the evidence presented at trial, the jury found appellant guilty of trafficking and possessing marijuana that equaled or exceeded 40,000 grams. With respect to the forfeiture specification, the jury found that only $121,936 in currency and a 2012 Cadillac Escalade were subject to forfeiture.[4] The matter proceeded to sentencing, where the court determined that the trafficking and possession offenses were allied offenses subject to merger. The state elected to proceed on the trafficking in marijuana offense, and the trial court imposed an eight-year mandatory prison sentence and a $7,500 mandatory fine on appellant.

{¶23} Appellant appealed, raising four assignments of error for review. For ease of discussion, appellant's third and fourth assignments of error will be addressed together.

{¶24} Assignment of Error No. 1:

{¶25} THE TRIAL COURT ERRED BY NOT ORDERING A SPECIAL PROSECUTOR WHERE A COUNTY ASSISTANT PROSECUTOR SPENT A NIGHT DRINKING AND THEN SLEEPING IN BED WITH APPELLANT.

{¶26} In her first assignment of error, appellant contends the trial court erred by not granting her motion to disqualify the Clermont County Prosecutor's Office after it came to light that appellant and a former assistant prosecutor spent an evening drinking and socializing with one another. Appellant maintains that a conflict of interest should have

---

4. Prior to submitting the case to the jury, the trial court granted appellant's Crim.R. 29 motion as it related to the forfeiture specifications for appellant's Lexus IS250, Nissan Altima, and the AK-47.

precluded the Clermont County Prosecutor's Office from prosecuting the case and that the court's failure to disqualify the prosecutor's office violated her right to a fair trial and due process of law.

{¶27} The record indicates that on July 6, 2018, more than two months before appellant was indicted, appellant had a chance meeting at a local bar with "RH," an assistant prosecuting attorney with the Clermont County Prosecutor's Office. Appellant and RH were both drinking. Appellant initiated contact with RH after learning from a friend that RH was an attorney. When appellant mentioned to RH that her home had been "raided," RH interjected to ask where her home was located. After being advised appellant's home was in Clermont County, RH informed appellant he was an assistant prosecutor with Clermont County and he could not discuss the matter with her. At this point in time, RH had no knowledge of appellant or of law enforcement's investigation into her activities.

{¶28} Appellant contends that despite RH stating he could not discuss the matter with her, RH kept bringing the topic up during the evening, asking her if she had a lawyer, and if she wanted him to call her attorney. RH denied that he had any further contact with appellant regarding law enforcement's investigation of her activities. RH did not contact appellant's attorney; however, RH admitted to texting Lt. DeRose around midnight to confirm appellant was the target of an investigation. Lt. DeRose confirmed the investigation the next morning, around 7:00 a.m. RH did not inform appellant he sent Lt. DeRose a text; nor did he inform appellant of the response he received.

{¶29} On the evening of July 6, 2018, appellant and RH left the bar and went to a mutual friend's home, where they continued drinking. Appellant, RH, and their mutual friends spent time in a hot tub together. After getting out of the hot tub, the homeowner offered to let everyone stay overnight so that they would not be driving after drinking. RH and appellant slept in the same bed, although they did not engage in any sexual activity.

Though appellant claimed she only stayed out of fear after RH grabbed her by the arm and told her she was not going anywhere, text messages appellant sent to RH the following day undercut this claim. In the text messages, appellant unsuccessfully sought to make future plans with RH. RH did not, however, have any future contact with appellant.

{¶30} Approximately a month later, at the beginning of August 2018, a fellow prosecutor mentioned appellant by name during a discussion at the prosecutor's office. RH told the other prosecutor not to further discuss the case and disclosed his July 6, 2018 contact with appellant. RH did not have any further discussion or conversation with that prosecutor or any other assistant prosecutors about appellant. On August 7, 2018, RH resigned from the Clermont County Prosecutor's Office. More than a month later, on September 11, 2018, appellant was indicted for her involvement in the drug operation.

{¶31} Following her indictment, appellant filed a "Motion Requesting Withdrawal/Disqualification of Clermont County Prosecutor's Office" and supported her memorandum with an affidavit. The prosecutor's office opposed the motion and submitted an affidavit from RH. The trial court held a hearing on the motion on March 7, 2019, with appellant and RH both testifying. During the hearing, no evidence was presented that RH had obtained any incriminating statements or evidence from appellant or that RH had any involvement in the investigation, charging decisions, indictment or prosecution of appellant. At the close of the hearing, defense counsel conceded that he could not identify any way in which the encounter between appellant and RH had violated appellant's due process rights or prejudiced her.

{¶32} On March 12, 2019, the trial court issued a decision denying appellant's motion to disqualify the Clermont County Prosecutor's Office. The court found that no attorney-client relationship existed between appellant and RH and that the mere appearance of impropriety was not sufficient to warrant disqualification of the entire

prosecutor's office. Specifically, the court stated:

> [RH's] testimony that he had no involvement or input into the investigation, indictment, or prosecution of [appellant] is unrefuted. Given his resignation from the prosecutor's office in August of 2018, [RH] will play no role at trial. Frankly, [RH] obtained no information from [appellant] that wasn't already known by law enforcement after they executed the search warrant on her residence in January of 2018. Given [appellant's] inability to demonstrate any prejudice, disqualification of the entire Clermont County Prosecutor's Office is not warranted in this case.

{¶33} We review a trial court's decision on a motion to disqualify under an abuse-of-discretion standard of review. *State v. Goff*, 4th Dist. Lawrence No. 11CA20, 2013-Ohio-42, ¶ 59. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's decision was arbitrary, unreasonable, or unconscionable. *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 13.

{¶34} "A decree disqualifying a prosecutor's office should only be issued by a court when actual prejudice is demonstrated." *State v. Hennessey*, 12th Dist. Clermont No. CA2020-01-002, 2020-Ohio-5232, ¶ 23. "In making the determination, relevant factors may include, 1) the type of relationship the disqualified prosecutor previously had with a defendant, 2) the screening mechanism, if any, employed by the office, 3) the size of the prosecutor's office, and 4) the involvement the disqualified prosecutor had in the case." *Id.*, citing *State v. Morris*, 5th Dist. Stark No. 2004CA00232, 2005-Ohio-4967, ¶ 15. "Prejudice will not be presumed by an appellate court where none is demonstrated." *Id.*, citing *State v. Freeman*, 20 Ohio St.3d 55 (1985). Furthermore, "[t]he mere appearance of impropriety is insufficient to warrant the disqualification of an entire prosecutor's office." *State v. White*, 8th Dist. Cuyahoga No. 82066, 2004-Ohio-5200, ¶ 25.

{¶35} Appellant contends consideration of the above-mentioned factors supports her motion to disqualify the Clermont County Prosecutor's Office. With respect to the first

factor, appellant asserts that she and RH established an attorney-client relationship which required the entire prosecutor's office to be disqualified pursuant to Professional Conduct Rule 1.10. This rule provides as follows:

> While lawyers are associated in a *firm*, none of them shall represent a client when the lawyer *knows* or *reasonably should know* that any one of them practicing alone would be prohibited from doing so by Rule 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the *firm*.

(Emphasis sic.) Prof.Cond.R. 1.10(a).

{¶36} However, as Comment 7 to this rule explains, "[u]nder Rule 1.11(d), where a lawyer represents the government after having served clients in private practice * * * former-client conflicts are not imputed to government lawyers associated with the individually disqualified lawyer." Prof.Cond.R. 1.10, Comment 7. Moreover, "[b]ecause of the special problems raised by imputation within a government agency, [Prof.Cond.R. 1.11(d)] does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to other associated government officers or employees, although ordinarily it will be prudent to screen such lawyers. Prof.Cond.R. 1.11, Comment 2.

{¶37} Neither the Rules of Professional Conduct nor consideration of the factors set forth in *Hennessey* required disqualification of the Clermont County Prosecutor's Office. RH did not have an attorney-client relationship with appellant. He provided no legal service or advice to her. As soon as appellant stated her "raided" home was in Clermont County, RH informed appellant he could not discuss her legal situation due to his employment as an assistant prosecutor.

{¶38} RH's "relationship" with appellant consisted of a single night of socializing and did not involve intimacy. RH was not involved in any aspect of the investigation or prosecution of appellant's case. Rather, RH distanced himself from the case. RH informed

his superiors of his encounter with appellant and then resigned from the prosecutor's office without ever discussing the specifics of appellant's case. Finally, defense counsel conceded appellant was unable to demonstrate any prejudice that resulted from appellant's encounter with RH.

{¶39} Accordingly, based upon the facts and record before us, we conclude that the trial court did not abuse its discretion in denying appellant's motion to disqualify the Clermont County Prosecutor's Office. Appellant's first assignment of error is overruled.

{¶40} Assignment of Error No. 2:

{¶41} THE TRIAL COURT ERRED BY PROHIBITING THE JURY FROM VIEWING THE ENTIRE UNINTERRUPTED INTERROGATION OF APPELLANT.

{¶42} In her second assignment of error, appellant argues the trial court abused its discretion in denying her request to play for the jury and to admit into evidence the full recording of her interview with law enforcement. Appellant contends by redacting certain portions of the interview, she was denied the right to cross-examine Agent Taylor about his claim that he established a good rapport with her during the interview. She also claims that by redacting a two-hour portion of the video where she sat by herself in the interview room while awaiting law enforcement, the jury was deprived of the opportunity to "determine whether her subsequent statements were [made] out of duress, exhaustion, stress, or a combination of those factors."

{¶43} "A trial court's decision to admit or exclude evidence will not be reversed by a reviewing court absent an abuse of discretion." *State v. McLaughlin*, 12th Dist. Clinton No. CA2019-02-002, 2020-Ohio-969, ¶ 42.

{¶44} The record reveals that over defense counsel's objection, the trial court permitted the redaction of statements one of the officers made to appellant about the felony-level of the offenses and the amount of prison-time she faced as a result of her involvement

in the marijuana operation. In permitting this redaction, the court indicated that if on cross-examination defense counsel challenged Agent Taylor on how he built rapport with appellant, the evidence could become relevant and the court would address the admissibility of the statements at that time. However, the record reveals that appellant failed to question Agent Taylor or Lt. DeRose about their interview methods. The redacted statements, therefore, never became relevant.

{¶45} Furthermore, admission of such statements would have been prejudicial and improper. "A jury should not normally be told the potential sentences a criminal defendant faces for the charged offenses." *State v. Bajaj*, 7th Dist. Columbiana No. 03 CO 16, 2005-Ohio-2931, ¶ 163, citing *State v. Hudson*, 5th Dist. Delaware No. 02 CAA 12065, 2003-Ohio-7049, ¶ 87-89. After all, "the subject of disposition is a matter for the court and not the jury." *State v. Rogers*, 17 Ohio St.3d 174, 182 (1985). As appellant failed to cross-examine either Agent Taylor or Lt. DeRose on their interview methods and the redacted statements addressed sentencing issues that fall outside the province of the jury, we find that the trial court did not abuse its discretion in excluding those statements from evidence.

{¶46} We further find that the trial court did not abuse its discretion in ruling inadmissible that the portion of the recording which showed appellant waiting in the interview room by herself for two hours prior to law enforcement questioning her about her involvement in the marijuana operation. The video depicting appellant sitting alone in a room for two hours was duplicative of testimony defense counsel obtained on cross-examination, wherein Agent Taylor admitted appellant sat in a room at the police department by herself "probably [for] a couple of hours" before the interview began. Since defense counsel was given the opportunity to cross-examine Agent Taylor and Lt. DeRose about the two-hour wait, the court did not abuse its discretion in excluding that portion of the recording.

{¶47} Furthermore, though appellant now claims that the two-hour delay in questioning was relevant to show that her statements to law enforcement were made under duress or as a result of exhaustion, she did not advance this defense at trial. When questioned about the statements she made to Agent Taylor and Lt. DeRose during her police interview, appellant did not testify the statements were inaccurate or brought on by exhaustion or duress. Given these circumstances, the trial court did not err in finding that the recording of the two-hour wait was not relevant, and it was properly excluded at trial.

{¶48} Appellant's second assignment of error is overruled.

{¶49} Assignment of Error No. 3:

{¶50} THE JURY ERRED BY FINDING APPELLANT GUILTY WHEN THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION.

{¶51} Assignment of Error No. 4:

{¶52} THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶53} In her third and fourth assignments of error, appellant contends that her convictions for trafficking in marijuana and possession of marijuana are not supported by sufficient evidence and are against the manifest weight of the evidence. Specifically, appellant maintains that there was no evidence that she was knowingly "involved with or complicit in trafficking in marijuana" as the state failed to present evidence that she engaged in hand-to-hand transactions or transported or touched the contraband. She further argues there was no evidence that she knowingly possessed or exercised physical control over the contraband found in her home.

{¶54} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence

in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶55} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.,* citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150,

¶ 19.

{¶56} Appellant was convicted of complicity to trafficking in marijuana and possession of marijuana. "A charge of complicity may be stated in terms of [the complicity statute] or in terms of the principal offense." R.C. 2923.03(F). *See also State v. Herring*, 94 Ohio St.3d 246, 251 (2002).

{¶57} R.C. 2925.03(A)(2), the trafficking statute, provides that "[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or controlled substance analog is intended for sale or resale by the offender or another person." If the controlled substance is marijuana and the amount of marijuana equals or exceeds 40,000 grams, the offense is a second-degree felony. R.C. 2925.03(C)(3)(g).

{¶58} R.C. 2925.11(A), the possession statute, provides that "[n]o person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." If the controlled substance is marijuana and the amount equals or exceeds 40,000 grams, the offense is a second-degree felony. R.C. 2925.11(C)(3)(g). Possession is defined as "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). Possession may be actual or constructive. *State v. Fultz*, 12th Dist. Butler No. CA2015-06-103, 2016-Ohio-1486, ¶ 12. Constructive possession exits when one is conscious of the presence of the object and able to exercise dominion and control over it, even if it is not within one's immediate physical possession. *State v. Graves*, 12th Dist. Clermont No. CA2015-03-022, 2015-Ohio-3936, ¶ 22. "Constructive possession may be proven by circumstantial evidence alone." *Fultz* at ¶ 12. Absent a defendant's admission, the surrounding facts and circumstances, including a

defendant's actions, are evidence that a trier of fact may consider in determining whether the defendant had constructive possession. *Graves* at ¶ 22. "The discovery of readily accessible drugs in close proximity to the accused constitutes circumstantial evidence that the accused was in constructive possession of the drugs." *Fultz* at ¶ 13. "[T]wo or more persons may have possession of an object together if they have the ability to control it, exclusive of others." *State v. Peyton*, 12th Dist. Butler No. CA2015-06-112, 2017-Ohio-243, ¶ 44.

{¶59} Pursuant to the complicity statute, "[n]o person, acting with the kind of culpability required for the commission of an offense shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). A person must act "knowingly" to traffic in marijuana or possess marijuana. R.C. 2925.03(A)(2); R.C. 2925.11(A). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶60} To be complicit to a crime by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "[A] person's mere association with a principal offender is not enough to sustain a conviction based upon aiding and abetting." *State v. Coldiron*, 12th Dist. Clermont Nos. CA2003-09-078 and CA2003-09-079, 2004-Ohio-5651, ¶ 17. The accused "must actively participate in some way and contribute to the unlawful act to aid or to abet." *State v. Davis*, 12th Dist. Madison No. CA2015-05-015, 2016-Ohio-1166, ¶ 49, citing *State v. Salyer*, 12th Dist. Warren No. CA2006-03-039, 2007-Ohio-1659, ¶ 27. Aiding and abetting may be shown through either direct or circumstantial evidence, and "'participation in criminal intent may be inferred from the presence, companionship, and conduct before and after the offense is committed.'" *In*

*re B.T.B.*, 12th Dist. Butler No. CA2014-10-199, 2015-Ohio-2729, ¶ 19, quoting *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, ¶ 29 (8th Dist.).

{¶61} After reviewing the record, weighing inferences and examining the credibility of the witnesses, we find appellant's convictions for trafficking in over 40,000 grams of marijuana and possession of over 40,000 grams of marijuana are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. The state established that appellant assisted and encouraged the trafficking in and possession of marijuana as part of her son's drug enterprise. Appellant knowingly permitted Bryan to operate his business out of her home-office and she knowingly permitted him to keep 49,374.3 grams, or 125 pounds, of marijuana in her home. Appellant was aware that marijuana was in her home, as evidenced by Bryan's testimony that appellant had walked in on him with the drugs on least one occasion and appellant's admissions to law enforcement that she knew something was going on and she had been yelling at Bryan to "get it," meaning the drugs, out of her home for weeks. Appellant also admitted to smelling the marijuana and to being "neck-deep" in the drug operation.

{¶62} Evidence of the drug operation was pervasive throughout appellant's home. In addition to the odor and presence of marijuana, there were digital scales, packaging materials, large amounts of cash, currency counters, and drug ledgers in multiple rooms throughout the house. There was also a steady parade of people entering and leaving appellant's residence, some of whom were known to have visited while appellant was at the residence. These individuals went into the home with empty bags and backpacks and left with full bags. The marijuana in appellant's home was readily accessible to appellant and subject to her control, as evidenced by the fact that the office was not locked when law

enforcement arrived to conduct the search, loose marijuana was found in the spare bedroom, and a bag of marijuana was found in appellant's kitchen.

{¶63} The state also presented evidence that appellant assisted in transporting marijuana from California to Ohio. After flying to California with Bryan and his family, appellant rented a car so that she could drive two suitcases back to Ohio. Although appellant and Bryan claimed that the suitcases held baby clothes and that appellant drove the suitcases to Ohio in order to save Bryan an $85 luggage fee, the jury was entitled to reject this claim. The jury could find that this explanation did not make sense in light of the expenses associated with renting a vehicle and driving it across the country. Furthermore, Bryan had admitted to making $50,000 a week from his trafficking operation, and he stated he made so much money that he "forgot" about $20,000 that he left in his mother's bedroom. That he would ask his mother to rent a vehicle to drive to Ohio to save $85 is, therefore, incredulous. Especially in light of Bryan's testimony that he often used one of the suitcases – the pink suitcase – to store marijuana.

{¶64} Based on the forgoing evidence, the trier of fact was entitled to find appellant guilty of complicity to trafficking in marijuana and possession of marijuana. Though appellant and Bryan attempted to shift appellant's involvement in the offenses away from her and solely onto Bryan's shoulders, there was ample evidence presented that appellant was an active participant in her son's trafficking business and that she knowingly possessed the marijuana found in her home. In finding appellant guilty, the jury was free to disregard appellant's and Bryan's testimony that appellant was not involved in the offenses. *See State v. Woodward*, 12th Dist. Warren No. CA2016-09-084, 2017-Ohio-6941, ¶ 24 (noting that "[t]the jury, as the trier of fact was free to believe all, part, or none of the testimony of each witness who appear[ed] before it"). Furthermore, appellant's convictions are not against the manifest weight of the evidence merely because the trier of fact believed the testimony

of the state's witnesses. *State v. Crossty*, 12th Dist. Clermont Nos. CA2017-01-003 thru CA2017-01-005, 2017-Ohio-8267, ¶ 68.

{¶65} Accordingly, given the overwhelming amount of evidence presented by the state establishing that appellant participated and assisted in the trafficking and possession offenses, we find that appellant's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The trier of fact did not lose its way or create such a manifest miscarriage of justice that appellant's convictions must be reversed. We therefore overrule appellant's third and fourth assignments of error.

{¶66} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.